**In re AIR VERMONT, INC. and North Atlantic Airlines, Inc., Debtors.**

**Bill WATKINS and Security Corp. South, Plaintiffs,**

v.

**AIR VERMONT, INC., Defendant.**

**Bankruptcy Nos. 84–19, 84–17.**

United States Bankruptcy Court, D. Vermont.

Nov. 9, 1984.

See also, Bkrtcy., 44 B.R. 433, Bkrtcy., 44 B.R. 446.

David D. Robinson, Rutland, Vt., for Bill Watkins and Sec. Corp. South.

Brian Dempsey, Office of Joseph C. Palmisano, Barre, Vt., for debtor.

Douglas J. Wolinsky, Burlington, Vt., for Gene R. Kazlow.

## MEMORANDUM AND ORDER

CHARLES J. MARRO, Bankruptcy Judge.

The debtors, North Atlantic Airlines, Inc. and Air Vermont, Inc. (Air Vermont), filed separate petitions for relief under chapter 11 of the Bankruptcy Code (Code) on January 30 and 31, 1984, respectively. The cases were subsequently consolidated, as all physical assets of the two corporations are owned by Air Vermont. The instant matter is before the court on the motion of Bill Watkins (Watkins) and Security Corporation South (Security South) for relief from the automatic stay of Code section 362(a). The litigation is a dispute as to whether the transaction which is the subject matter of this proceeding constitutes a lease or, alternatively, a sale. A hearing, after notice, was concluded on October 17, 1984.

### FACTS

Watkins, a businessman whose principal occupation consists of buying and selling jewelry, is the sole stockholder of Security South, a corporation whose sole asset is a

1972 Piper Seneca aircraft, model number PA 34–200, serial number 34–7250255, Federal Aviation Administration (F.A.A.) registration number N 5385T (aircraft). The aircraft was purchased by Security South from Jack Wall Aircraft Sales, Inc. (Jack Wall) on June 12, 1978. The purchase was financed by Commercial Credit Equipment Corporation (Commercial Credit) under an aircraft security agreement executed on June 19, 1978, by Security South as buyer and Jack Wall as seller, which agreement contained an assignment of the seller's security interest to Commercial Credit. The aircraft bill of sale transferring ownership to Security South, the aircraft security agreement and the assignment thereof, and an aircraft registration application in the name of Security South, were recorded by the F.A.A. on July 14, 1978. The cash price of the aircraft was $39,908.38 and the downpayment $6,000.00 leaving an unpaid balance of $33,908.38 to be paid in 72 equal successive monthly installments of $637.81 commencing July 28, 1978, for a total time balance of $47,362.32.

Watkins used the aircraft in connection with his jewelry business until June 1981, when his then pregnant wife, who usually accompanied him on business junkets, could no longer accompany him were he to travel by air. As of June 1981 the aircraft engine time was 1,350 flight hours; the F.A.A. "time between overhaul" rules require renewal of the aircraft engines at 1,400 flight hours. The aircraft, which needed radio, control equipment, and brake repairs, deteriorated as it remained in tie-down position from June through November 1981 inclusive. As of November 1981 the balance due to Commercial Credit was roughly $20,000.00. The value of the aircraft, had it been in good condition in November, would have been roughly $27,000.00; in its actual condition it was worth, at top dollar, about $15,000.00.

In November 1981 Watkins advertised the aircraft for lease. John Porter (Porter), president of Air Vermont, responded to the advertisement with an offer to purchase. After checking Porter's credit references, Watkins informed Porter that he would not sell, but would lease if Porter could provide "up-front" money. Porter consented. Watkins had his attorney draw an aircraft lease agreement, which "Bill Watkins" and Jack Crognale, acting as authorized agent of, an attorney in fact for, Porter as president of Air Vermont, executed on December 1, 1981.

On or about April 22, 1982, Porter as president of Air Vermont executed another document entitled "Aircraft Lease Agreement" which he forwarded to Watkins' attorney and which Watkins' attorney received on or about April 22, 1982. This document was never executed by or for Watkins or Security South.

The provisions of the December 1981 and April 1982 documents are identical except as follows. The December 1981 document contains the following provision written by hand in ink at the physical end of the document, and initialed by the signatories, Jack Crognale and Bill Watkins:

"It is further understood and agreed that if all the above conditions have been fully complied with and the propellers and engines of said airplane are overhauled, the sum of $880.00 shall be deducted from the final purchase price of the aircraft."

The aircraft lease agreement of April 1982 contains the following typewritten provision at the physical end of the document:

"It is further understood and agreed that if all the above conditions have been fully complied with and the propellers and engines of said aircraft are overhauled the sum of $2,000.00 shall be deducted from the final purchase price."

The remaining, identical provisions of the two documents provide that Bill Watkins as lessor leases the aircraft to Air Vermont as lessee for a term of 31 months commencing December 2, 1981 and ending June 2, 1984, at a monthly rental of $657.81; that neither the aircraft nor any interest therein may be encumbered, sold, lent, assigned, disposed of or sublet without prior written approval of the lessor; that Air Vermont accepts delivery of the aircraft "as is...where is", and agrees to pay all taxes accruing during

the lease term; that Air Vermont will insure the aircraft and maintain it in good condition; and that Air Vermont assumes the risk of loss. Further, the lease provides that rent "shall not abate during the term" and that repossession may occur in the event of default, but that in the event of repossession no deficiency would be assessed. Under the lease, Watkins assigned to Air Vermont such manufacturer's warranties as may accompany the aircraft into the hands of Air Vermont; however, for the reason that Watkins "is not a manufacturer or engaged in the sale or distribution of the aircraft," Watkins "makes no representations...or warranties..."

The lease specifically states that it is intended by the parties to be a lease and that Air Vermont is not to acquire any right, title or interest whatsoever, legal or equitable, in the aircraft or to any proceeds of any sale of the aircraft, except a lessee's interest, and except as it may exercise its option to purchase the aircraft at the termination of the lease on June 2, 1984, for $8,000.00 cash or $8,165.40 deferred over 13 monthly installments. The option to purchase would be available to Air Vermont if Air Vermont "faithfully performed all of its obligations...until the time of its final rental payment at the termination of this lease, on June 2, 1984." Watkins promised to "duly execute and deliver...all documents necessary and proper to effect transfer of ownership of the aircraft...free and clear of all encumbrances...upon payment...of the full amount of the option price..."

Under the lease, and as provided therein, Air Vermont made an initial payment of $2,628.00 of which $657.81 was a monthly rental payment and the balance of $1,970.19 was a security deposit to be held by Watkins until the expiration of the term of the lease, to be repaid to Air Vermont upon compliance with all terms incorporated in the lease. The lease required Air Vermont to return the aircraft to a place not more than 150 miles from the point of original delivery of the aircraft in the event the purchase option was not exercised.

On bankruptcy day Air Vermont was in default under the lease for an amount of at least $3,946.86 in unpaid rent. Prior to bankruptcy day, Air Vermont as lessee made certain improvements and repairs to the aircraft with the result that its value on bankruptcy day was roughly $25,000.00.

The schedules of financial affairs filed in connection with the case list Bill Watkins and Commercial Credit, conjunctively, as a secured creditor in the sum of $13,172.57 collateralized by the aircraft. Watkins is also listed as an unsecured creditor as to accruing interest in the amount "UNKNOWN."

No document with respect to the Watkins-Air Vermont transaction has been filed with the F.A.A.

## DISCUSSION

The issue is whether the December 1981 document constitutes a lease or a security agreement, *i.e.* whether the Watkins-Air Vermont transaction was a lease or a sale. The April 1982 document is not relevant to this case for the reason that it was never executed by or for Watkins or Security South.

■ Whether an agreement is a true lease or a security agreement is determined by the objective intent of the parties at formation. Uniform Commercial Code (U.C.C.) § 9–102 Uniform Laws Comments. To determine objective intent, the court looks to the contents of the document and to the factual setting of the transaction, *Matter of Brookside Drug Store, Inc.*, 3 B.R. 120, 122 (Bankr.D.Conn.1980), as well as to the subsequent treatment of the agreement by the parties, *In re Kors, Inc.*, 13 B.R. 683 (Bankr.D.Vt.1981), *aff'd*, Civil Action No. 81–346 (D.Vt.1982). The issue is governed by U.C.C. sections 9–102(1)(a) and 1–201(37). Section 9–102(1)(a) provides that U.C.C. article 9 applies to any transaction, regardless of its form, which is intended to create a security interest in personal property or fixtures. Section 1–201(37) provides in part that whether a lease is intended as security is to be determined by

the facts of each case. If the agreement's provisions suggest that the parties intended that the lessee acquire a proprietary interest in the property, the agreement in legal effect is one intended for security regardless of the form of the transaction or the name by which the parties may have christened it. U.C.C. § 9–102(1)(a) Uniform Laws Comments. Conversely, if at the end of the lease term the lessor has the absolute right to retake control and use the property, a true lease arrangement may be inferred. See, e.g., In re Tulsa Port Warehouse Co., Inc., 690 F.2d 809 (10th Cir. 1982). However, the form and language of the agreement is not controlling, nor does any single clause or characteristic of the agreement control; the issue is whether under all the facts and circumstances, the effect of the provisions of the agreement indicates the objective intent to create an operating lease or to effectuate an installment sale.

The cases scrutinize a number of factors to determine whether a self-denominated lease is in fact a "hidden" security agreement: whether (1) there is an option to purchase for a nominal sum at the end of the lease term, (2) the lease grants the lessee an equity or property interest, (3) the lessor's business is that of a financing agency, (4) the lessee pays sales tax incident to the acquisition or pays all other taxes normally associated with ownership, (5) the lessee is responsible for comprehensive insurance, (6) the lessee is required to maintain the equipment at its expense, (7) the agreement places the risk of loss on the lessee, (8) the agreement permits the lessor to accelerate the payment of rent upon default or provides the lessor with other remedies similar to those of a mortgagee, (9) the lessee is required to pay a substantial security deposit, (10) a financing statement is executed by the lessee in connection with the lease, (11) there are default provisions inordinately favorable to the lessor, (12) the lease provides for liquidated damages, (13) a lease provision disclaims warranties, (14) the aggregate rentals approximate the value of the subject matter of the lease. See, Matter of Brookside Drug Store Inc., supra, 3 B.R. at 123.

 Factors tending to indicate a true lease are: (a) the existence of a purchase option price which approximates the market value at the time of exercise of the option; (b) rental charges that indicate an intention to compensate the lessor for loss of value over the term of lease due to aging and obsolescence; (c) rentals that are not excessive, and (d) the lessee acquired no equity in the leased items during lease term. See In re Tucker, 34 B.R. 257, 260, 261 (Bankr.W.D.Okla.1983). Among the factors which tend to indicate that a so-called lease is a security transaction are: (a) the lessee is required to obtain insurance in an amount roughly equivalent to the total rental payments; (b) the risk of loss and damage is placed on the lessee; (c) the lessee is required to pay for taxes, repairs, and maintenance; (d) default provisions provide for acceleration and repossession; (e) there is a substantial non-refundable deposit requirement; (f) the subject matter of the lease is to be acquired from or selected by a third party; (g) the rental payments are a reasonable equivalent of a market-rate deferred payment price of the subject matter; (h) the lease is to be discounted with a bank; and (i) warranties generally found in a lease are excluded by the agreement. See, In re Tucker, supra, 34 B.R. at 261, and authorities cited.

 The primary purpose of the instant agreement was not to create a security interest in the aircraft; rather, it was to provide Air Vermont with possession of the aircraft for use in connection with its operations. As the language of the agreement makes clear, Air Vermont could obtain no proprietary interest in the aircraft during the life of the agreement. The practical construction adopted by the parties comported with the language of the agreement: neither party filed with the F.A.A. any document evidencing the transaction. No bill of sale or registration application was filed by Air Vermont; no financing statement, installment sale contract, nor even the instant agreement was filed by Wat-

kins. Objective indicia of the parties' subjective intent abound: in connection with the transaction (a) no sales or transfer tax was paid; (b) no provision for liquidated damages was made; (c) Air Vermont's monthly payment was negotiated to be the amount of Watkin's monthly payment to Commercial Credit; (d) there was no nonrefundable security deposit; (e) there were no provisions for deficiency or acceleration in the event of default. The circumstances surrounding negotiation of the agreement, the express language of the agreement, and the parties' performance history establishes that the instant agreement was not intended to have effect as security but was intended to be a true lease.

As applied cummulatively to this matter, the factors elaborated by the cases compel the conclusion that the instant agreement is an operating lease and is not a "hidden" security agreement, notwithstanding that Air Vermont obligated itself for the full rent accruing during the lease term even were Air Vermont's use and possession to discontinue. Watkins was a jeweller, not an aircraft financier; he bought the aircraft for use during business junkets, not for the purpose of entering into the instant agreement. Although Air Vermont bore the risk of loss under the agreement, Watkins, on the other hand, did not reserve in himself the panoply of remedies generally accorded a mortgagee. Although Air Vermont paid license fees and taxes accruing during the term of the agreement, Watkins provided himself the remedy only of repossession should Air Vermont fail to faithfully perform its obligations. Although Air Vermont bore maintenance costs, Watkins, neither a maker of nor dealer in aircraft, assigned to Air Vermont such manufacturers' warranties as could follow the aircraft into Air Vermont's hands. Moreover, the total payments due to Watkins under the lease do not equate with the value of the aircraft as leased. On balance, the court concludes that the objective intent of the parties establishes little ground for construing the instant document as a security agreement, but establishes substantial ground for construing the document as a lease.

Air Vermont argues that the June 1984 option purchase price constitutes nominal consideration as compared to the value of the aircraft at the time of the would-be exercise of the option, and that the agreement is therefore properly a security agreement. However, no single factor is determinative; the issue is whether under all the facts and circumstances the effect of the provisions indicates the objective intent that the agreement take effect as security. Further, to determine whether an option to purchase is for nominal consideration, the option price should be compared with the fair market value of the subject matter, not as of the time the option is to be exercised, but as of formation of the agreement. *See, e.g., Matter of Wheatland Electric Products Co.,* 237 F.Supp. 820, 822, 2 U.C.C.Rep.Serv. 486, 488 (W.D.Pa.1964); *In re Alpha Creamery Co., Inc.,* 4 U.C.C.Rep.Serv. 794, 798 (W.D. Mich.1967). In the instant case, the option purchase price of $8,000.00 is over 53 per cent of the relevant valuation. The cases show that an option price of 53 per cent of the value, at formation, of the subject matter is substantial, and not nominal, consideration. *See, e.g., Matter of Wheatland Electric Products Co., supra,* 237 F.Supp. at 822 (option price of 25% was substantial); *In re Alpha Creamery Co., Inc., supra,* 4 U.C.C.Rep.Serv. at 798 (Option price of 32% was substantial); *In re Universal Medical Service, Inc.,* 8 U.C.C.Rep. Serv. 614, 617 (E.D.Pa.1970) (option price of 10% was not nominal). Where, as here, the option price constitutes substantial consideration, the underlying agreement may appropriately be construed as a lease.

Air Vermont also argues that, were it to have taken the agreement to term it would have had no reasonable economic alternative to the exercise, at full term, of the option, and that under the "economic compulsion test" the instant agreement should be construed as a security agreement. The argument is misplaced for the reason that, in large part, the present value of the air-

plane derives from substantial repairing and refinishing work as to the aircraft which Air Vermont contemplated prior to, and carried out subsequent to, formation of the agreement in order to render the aircraft airworthy and suitable for use in Air Vermont's operations. The economic compulsion test, however, is founded on the proposition that the "economic compulsion" arises out of residual value that was inherent in the subject matter at the time of execution of the relevant agreement. *See, e.g., Sight and Sound of Ohio v. Wright,* 36 B.R. 885 (D.Ohio 1983). The relevant value does not include value added by a lessee. The relevant value for determining economic compulsion in the instant case, then, is $15,000.00 less 31 months of depreciation, wear and tear. On this basis, it is not clear that there is no reasonable economic alternative to the exercise of the option to purchase for $8,000.00 an aircraft worth $15,000.00 less 31 months of depreciation, wear and tear.

For the reason that the instant agreement is a lease and is not a security agreement, Air Vermont obtained no proprietary interest in the subject matter during the term of the lease. Watkins has thus met his burden under Code section 362(d) of establishing that Air Vermont has no equity in the property. For the reason that the only reorganization plan pending contemplates liquidation of all Air Vermont's assets, Air Vermont has not met its burden of establishing that the aircraft is necessary for an effective reorganization. The result is that, under Code section 362(d), Watkins is entitled to prevail on his motion.

## ORDER

Upon the foregoing,

IT IS ORDERED that the motion of Bill Watkins and Security Corporation South for relief from stay is GRANTED.