**In re PAN AM CORPORATION, et al., Debtors.**

**No. 91 Civ. 1659 (MBM).**

United States District Court,
S.D. New York.

March 18, 1991.

Thomas J. Moloney, Jerome E. Hyman, Robert P. Davis, Howard S. Zelbo, Jonathan Willens, Jean E. Kalicki, Cleary, Gottlieb, Steen & Hamilton, New York City, for debtors.

Marvin E. Jacob, Bruce R. Zirinsky, Bruce N. Shortt, Jay M. Goffman, Gordon W. Johnson, Kurt W. Bjorklund, Steve Levitan, Weil, Gotshal & Manges, New York City, for General Elec. Capital Corp., Wilmington Trust Co., Cobblestone Corp., Evergreen Intern. Airlines, Inc. and Evergreen Ventures.

William C. Clarke, William R. Brennan, Lord Day & Lord, Barrett Smith, New York City, for amicus curiae America West Airlines, Inc., American Airlines, Inc., Northwest Airlines, Inc. and USAIR, Inc.

M.O. Sigal, Jr., Dan Sullivan, Simpson Thacher & Bartlett, New York City, for C.I.T. Leasing Corp. and C.I.T. Group/Equipment Financing, Inc.

## OPINION AND ORDER

MUKASEY, District Judge.

Pan Am Corporation, *et al.*, debtors and debtors in possession (collectively "Pan Am") filed a petition for reorganization under Chapter 11 of the Bankruptcy Code (the "Code") on January 8, 1991. On February 22, 1991, Pan Am moved in the Bankruptcy Court for the Southern District of New York, by order to show cause, for an order authorizing it to cure defaults in certain transactions pursuant to § 1110 of the Code and declaring that certain other transactions are not covered by § 1110. After notice, and a hearing on March 7, 1991, the Bankruptcy Court, Hon. Cornelius Blackshear, Bankruptcy Judge, issued an opinion from the bench and entered a written order dated March 8, 1991, granting in part and denying in part Pan Am's motion, and reserving decision on unresolved issues—in particular whether certain leases were ac-

tually loan transactions rather than true leases. Pan Am has informed this court, by letter dated March 11, 1991, that it is appealing the following dispositions contained in Judge Blackshear's March 8 order:

*Order ¶ 5:* "Transactions designated by Debtors as 'nonacquisition sale/leaseback transactions' are not disqualified from the protection of Section 1110 solely because they are 'nonacquisition sale/leaseback transactions.'"

*Order ¶ 8:* "The liens in favor of General Electric Capital Corporation ("GECC") securing the Debtors' obligations arising under the 1985 loans described in paragraphs 18–25 of the Declaration [of Joan Fabio, Assistant Treasurer of Pan American World Airways, Inc.] are purchase money security interests entitled to the protection of Section 1110 of the Code to the extent of the outstanding balance of the 1985 loans, to the extent GECC can identify the amount of the debt and the Aircraft and/or Equipment to which it relates."

At a hearing on March 8, 1991, this court denied Pan Am's request for a stay pending appeal of Judge Blackshear's order, but agreed to decide on an expedited basis the appeal of the sale-leaseback issue arising from paragraph 5 of the Bankruptcy Court's order.[1] This opinion relates only to that issue. A later decision will resolve the GECC purchase-money equipment security issue arising from paragraph 8 of the Bankruptcy Court's order. For the reasons set forth below, paragraph 5 of the order, determining that sale-leaseback transactions are within § 1110, is affirmed.

## I.

Section 1110 of the Bankruptcy Code provides in relevant part:

(a) The right of a secured party with a purchase-money equipment security interest in, or a lessor or conditional seller of, whether as trustee or otherwise, aircraft, aircraft engines, propellers, appliances, or spare parts, as defined in section 101 of the Federal Aviation Act of 1958, ... that are subject to a purchase money equipment security interest granted by, leased to, or conditionally sold to, a debtor that is an air carrier operating under a certificate of convenience and necessity issued by the Civil Aeronautics Board ... to take possession of such equipment in compliance with the provisions of a purchase money equipment security agreement, lease, or conditional sale contract, ... is not affected by section 362 or 363 of this title or by any power of the court to enjoin such taking of possession, unless—

(1) before 60 days after the date of the order for relief under this chapter, the trustee, subject to the court's approval, agrees to perform all obligations of the debtor that become due on or after such date under such security agreement, lease, or conditional sale contract, as the case may be; and

(2) any default, other than a default of a kind specified in section 365(b)(2) of this title, under such security agreement, lease, or conditional sale contract, as the case may be—

(A) that occurred before such date is cured before the expiration of such 60–day period; and

(B) that occurs after such date is cured before the latter of—(i) 30 days after the date of such default; and (ii) the expiration of such 60–day period.

. . . .

11 U.S.C. § 1110 (1991).

As mentioned, the only issue on this expedited appeal is whether the term "lessor" includes those lessors that acquired such status in "non-acquisition sale/leaseback transactions." Pan Am argues that Congress intended the statute to apply only in circumstances where a lessor leases aircraft and related equipment which are new to the airline. Therefore, Pan Am contends that "lessor" as used in § 1110 actually

---

1. Subsequently, Pan Am appealed this court's denial of a stay to the Court of Appeals for the Second Circuit. By order dated March 12, 1991, the Hon. Jon O. Newman, Circuit Judge, granted Pan Am's request for a stay, pending hearing and disposition of the stay motion before a full panel on March 19, 1991.

means "lessor of newly acquired equipment." The challenged sale-leaseback transactions are described in Exhibit A of the February 22, 1991 "Declaration of Joan Fabio in Support of Debtors' Motion ..." ("Fabio Decl."). The challenged leases and subleases involve approximately 29 assorted aircraft, including commuter planes operated by Pan Am Express, Inc., and one lease involving two Pratt & Whitney aircraft engines leased by Pan Am Express. If these lease transactions are outside the reach of § 1110, Pan Am will avoid the burden of curing approximately $33 million in pre- and post-petition defaults now existing with respect to those transactions. Fabio Decl., ¶ 2(b). Pan Am concedes for present purposes that § 1110 covers acquisition of any equipment new to the airline, even used equipment. Debtors' Memorandum of Law at 13, n. 2.

The lessors involved in the challenged sale-leaseback transactions contend that "lessor," as used in § 1110, unambiguously applies to any true lessor, and that the legislative history does not indicate that the leased equipment must be new to the airline—at least with the clarity required to edit a statute. This dispute presents a straightforward problem of statutory interpretation.

## II.

■ That straightforward problem is itself to be resolved by applying equally straightforward principles of statutory interpretation:

"The plain meaning of legislation should be conclusive, except in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters.'"

*United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989) (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)) (brackets in original). *See also Demarest v. Manspeaker,* —— U.S. ——, 111 S.Ct. 599, 604, 112 L.Ed.2d 608 (1991); *In*

*re Chateaugay Corp.,* 920 F.2d 183, 184 (2d Cir.1990).

This basic rule of statutory construction has been applied to interpret the very statute at issue here, § 1110. *In re Air Vermont,* 761 F.2d 130, 134 (2d Cir.1985) ("[where] the statute is unambiguous on its face ... the statute's literal meaning must be applied" unless "there is something to make plain the intent of Congress that the letter of the statute is not to prevail"). In *Air Vermont,* the Second Circuit, noting that "the statute's literal meaning must be applied," reversed an order of the bankruptcy court which read into § 1110 an additional, unstated statutory requirement that a conditional seller perfect its security interest by filing its contract with the Federal Aviation Administration. *Id.* at 134.

These principles of statutory construction do not call simply for a mechanical application of what some call "the plain meaning rule." Rather, courts may and should examine legislative history to determine a statute's purpose and then apply that purpose, if the plain meaning produces an "unreasonable" result *"plainly* at variance with the policy of the legislation as a whole...." *United States v. American Trucking Ass'n,* 310 U.S. 534, 543–44, 60 S.Ct. 1059, 1063–64, 84 L.Ed. 1345 (1940) (emphasis added). *See also Korea Shipping Association v. New York Shipping Ass'n,* 880 F.2d 1531, 1537 (2d Cir.1990) (declining to adopt dictionary meaning of "employer" under 29 U.S.C. § 1381(a) (ERISA) where that result would make multi-employer pension plans "victims of the *precise* threat Congress aimed to shield them from") (emphasis added). However, a court may not use its review of the legislative history to rewrite a statute merely because the court disagrees with the manner Congress chose to further its policy. *Louisiana Pub. Serv. Comm'n v. F.C.C.,* 476 U.S. 355, 376, 106 S.Ct. 1890, 1902, 90 L.Ed.2d 369 (1986).

On its face, the statute is unambiguous. To the extent a party is a true lessor and otherwise qualifies under the statute, it is entitled to the "extraordinary protection" of § 1110. *Vermont,* 761 F.2d at 132. The

terms "lessor," "leased" and "lease" are not modified in any way which suggests that the statute was not meant to apply to lessors in a sale-leaseback transaction. The one phrase of § 1110 which does modify the term "lessor"—"whether as trustee or otherwise"—is expansive, rather than restrictive. Therefore, by its terms, the statute protects all "lessors," and courts should not impose the additional requirement that the lease also involve equipment new to the airline, unless the literal result would be "demonstrably at odds with the intention" of Congress. *Ron Pair Enterprises,* 109 S.Ct. at 1031.

As thoroughly discussed in *In re Braniff, Inc.,* 110 B.R. 980, 983 (Bankr.M.D.Fla. 1990), the legislative history fails to demonstrate that Congress intended § 1110 to apply only to lessors of newly acquired equipment—at least with the level of clarity required for a court to edit a statute. Although the holding in that case may be somewhat limited by the court's reference to the debtor's status as a newly formed airline, an independent reading of the legislative history demonstrates that Congress did not "make plain [an] intent" to impose an acquisition element to lease transactions covered by § 1110, contrary to the "letter of the statute," which has no such element. *Vermont,* 761 F.2d at 134.

The immediate predecessor statute of § 1110 was § 116(5) of the Bankruptcy Act.[2] That statute, which was enacted in 1957, exempted "any owner" and "any other lessor" of equipment "leased, subleased or conditionally sold" to an airline from the provisions of chapter X of the Act. Section 116(5) of the Act in turn was based on an amendment to § 77(j), enacted in 1935, which earlier had given similar protection to "any owner, whether as trustee or otherwise, [of] rolling-stock equipment leased or

conditionally sold to the debtor...." *See* Act of August 27, 1935, Pub.L.No. 74–381, ch. 774, 49 Stat. 922. That provision had been enacted "[i]n view of the necessity of readily financing purchases of new equipment at a time when the development of the transportation art is providing new forms of equipment...." H.R.Rep. No. 1283, 74th Cong., 1st Sess. 4 (1935).

By its terms, § 116(5) gave protection to any party with title to leased equipment, and did not distinguish between lessors of equipment new to the airline and other lessors. Although the legislative history of that statute shows a Congressional concern with the need of airlines to "replace obsolete equipment with modern aircraft," the House Report reflects Congressional awareness that a major impediment to this goal was the inability of airlines to attract necessary capital. *See* H.R.Rep. No. 944, 85th Cong., 1st Sess., *reprinted in* 1957 U.S.Code Cong. & Admin.News 1926. The then-proposed amendment to the Act would "result in an increased availability of capital at a lower interest rate than would be demanded under present conditions." *Id.* Therefore, although Congress may have had the ultimate end in 1957 of encouraging airlines to acquire new equipment, one means to that end incorporated in the statute was to increase the availability and decrease the cost to an airline of capital. Thus, the encouragement of new equipment acquisition can in no way be considered directly contrary to the broad language which Congress chose to use. *See also In re Airlift Intern, Inc.,* 761 F.2d 1503, 1507 (11th Cir.1985) (the purpose of § 116(5) was "to enhance the borrowing ability of airlines"); 5 *Collier On Bankruptcy,* ¶ 1110.01, at 1110–3 (L.King 15th ed. 1990) (the predecessor provisions of § 1110 "were designed to afford equipment

---

**2.** Section 116(5) of the Act provided:

Notwithstanding any other provision of chapter X, the title of any owner, whether as trustee or otherwise, to aircraft, aircraft engines, propellers, appliances, and spare parts (as any of such are defined in the Civil Aeronautics Act of 1938, as now in effect or hereafter amended) leased, sub-leased, or conditionally sold to any air carrier which is operating pursuant to a certificate of convenience

and necessity issued by the Civil Aeronautics Board and any right of such owner or of any other lessor to such air carrier to take possession of such property in compliance with the provisions of any such lease or conditional sale contract shall not be affected by the provisions of chapter X if the terms of such lease or conditional sale so provide.

Pub.L. No. 85–295, 71 Stat. 617, *reprinted in* 1957 U.S.Code Cong. & Admin.News 681.

financers greater certainty than existed under the other provisions of the Bankruptcy Act concerning such financers").

When the current Bankruptcy Code was adopted in 1978, the category of protected creditors was expanded to include secured parties with a "purchase-money equipment security interest." To the extent the legislative history of § 1110 discusses prior law, it shows that Congress continued to be concerned with the need to encourage low cost financing of the airline industry. There is no clearly expressed intention for the new statute to restrict the types of lessors seemingly protected by the broad references in prior law to "any owner" or "any other lessor." In the House Report accompanying § 1110, Congress noted that the protection in the Bankruptcy Act had been "added as a means of encouraging new financing" in the airline industry. H.R.Rep. 595, 95th Cong., 1st Sess. 240, *reprinted in* 1978 U.S.Code Cong. & Admin.News 6199. The House Report further noted that "[w]hether or not there was an initial need for these provisions, their existence has become largely addicting to the financing industry, and now the industry claims it would simply cease financing of the relevant equipment if the protections were removed." *Id.*

Later on, discussing intended "changes" from the provisions of the prior Bankruptcy Act, the House Report first noted an intent "to preserve the limitations on the right of the financer contained in current law." *Id.* at 240, 1978 U.S.Code Cong. & Admin.News 6199. The Report then stated that in the new Bankruptcy Code, the list of protected transactions would be expanded to include "equipment security interests," with the limitation that "[t]he term includes only security interests that were granted to finance the acquisition of the covered equipment," while "[a] general mortgage is excluded." *Id.* Elsewhere, the report stated that "this section, to a large degree, preserves the protection given lessors" under prior law. *Id.* at 405, 1978 U.S.Code Cong. & Admin.News 6361.

The House Report explained the law's expansion to include certain secured lenders, and stated that the Bankruptcy Act had applied only to leases and conditional sales under the theory that in those transactions title to equipment remained with the "financer" and did not pass to the airline. *Id.* However, noting the changes in financing practices brought about by the adoption of Article 9 of the Uniform Commercial Code, in which a seller receiving a security interest did not retain title, the House Report then stated that "protection of security interests was added to make financing forms more flexible and more consonant with modern law." *Id.*

Pan Am cites these passages to argue that Congress intended the acquisition of newly acquired equipment to be a necessary element for *all* § 1110 transactions, including leases. However, that history demonstrates with precision only that Congress refused to include Article 9 transactions within § 1110 unless they included an acquisition element; it fails to show with any clarity that Congress also intended to add an acquisition element to lease transactions. Of course, with respect to Article 9 transactions, Congress also demonstrated its intention in the clearest way it could, through the words it used, by limiting the statutory protection to a "secured party with a *purchase-money* equipment security interest." 11 U.S.C. § 1110(a) (emphasis added). There is no such statutory restriction on lease transactions within § 1110.

Pan Am also cites the following passage from the Congressional record: "This section protects a limited class of financers of aircraft and vessels and is intended to be narrowly construed to prevent secured parties or lessors from gaining the protection of the section unless the interest of such lessor or secured party is explicitly enumerated therein." 124 Cong.Rec. S17,419 (daily ed. Oct. 6, 1978). That statement does not prove Pan Am's case because "the interest of such lessor ... [as] explicitly enumerated" in the statute is simply that of a "lessor" of qualified equipment to a qualified carrier. Moreover, the value of statements in the Congressional Record as barometers of legislative intent is minimal at best. *Begier v. I.R.S.,* —— U.S. ——, 110 S.Ct. 2258, 2268, 110 L.Ed.2d 46 (1990)

("Congress conveys its directions in the Statutes at Large, not in excerpts from the Congressional Record") (Scalia, J., concurring).

If anything, the legislative history of § 1110 suggests that the Congressional omission of an acquisition element in lease transactions under § 1110 was intentional. In particular, the House Report noted that the protection provided by § 1110 to lessors of aircraft equipment was similar to the protection provided to other types of lessors elsewhere in the Code, except that with respect to § 1110, debtors were forced to make a decision on whether to assume or reject a lease within 60 days. H.R.Rep. 595, 95th Cong., 1st Sess. 240, 1978 U.S. Code Cong. & Admin.News 6199. Section 365 is the general Code provision defining a debtor's rights and obligations with respect to unexpired leases. Unlike § 1110, § 365(d)(2) generally allows a debtor to assume or reject an unexpired lease of residential real property or of personal property "at any time before confirmation of a plan" unless a court orders otherwise, while § 365(b)(1) gives a debtor who chooses to assume an unexpired lease the option of either curing past defaults or "provid[ing] adequate assurance" of prompt cure. Significantly, § 365, like § 1110, also makes no distinction between leases of newly acquired equipment and leases that are part of a sale-leaseback transaction. Moreover, the text of § 365 demonstrates that when Congress wrote the Code, including § 1110, it knew how to distinguish among categories of lessors when it so desired. *See, e.g.,* § 365(h) (consequences to lessee of rejection by trustee of "an unexpired *lease of real property* of the debtor under which the debtor is the lessor") (emphasis added). Of course, § 1110 also distinguishes different types of lessors: it protects only lessors that lease qualified equipment to qualified airlines. However, Congress did not include the additional requirement that the qualified equipment be new to the qualified airline.

Pan Am argues also that because § 1110 *explicitly* limits protected security interests to those arising from acquisitions, it also *implicitly* limits leases in the same way. Yet by its terms, the statute protects "[t]he right of a secured party with a purchase-money equipment security interest in, *or* of a lessor *or* conditional vendor of, ... [qualified aircraft equipment]." 11 U.S.C. § 1110(a) (emphasis added). Pan Am's argument here contradicts both logic and rules of statutory construction. Congress placed explicit limitations on one group, by defining a protected secured party as "a secured party with a purchase-money equipment security interest," without similarly limiting another in the same statute: a "lessor" is not limited to a lessor of newly acquired equipment. That difference suggests the logical conclusion that Congress actually did *not* intend so to restrict the class of protected lessors. Although acquisition inheres in the conduct of the third group of protected parties, "conditional vendor[s]," because of the very nature of conditional sale transactions,[3] there is no such inherent acquisition element with respect to "lessor[s]." Leases arising out of sale-leaseback transactions are analyzed the same as ordinary leases. *See Frank Lyon v. United States*, 435 U.S. 561, 581, 98 S.Ct. 1291, 1302, 55 L.Ed.2d 550 (1978) (lessor in sale-leaseback entitled to depreciation deductions). Finally, when Congress separates words or phrases in a statute with the conjunction "or," the Supreme Court has directed courts to give each term its "ordinary, separate meaning." *Garcia v. United States*, 469 U.S. 70, 73–75, 105 S.Ct. 479, 481–82, 83 L.Ed.2d 472 (1984). Thus, the acquisition element explicitly imposed on secured parties, and the acquisition element inherent in the status of conditional vendors, implies no such acquisition element with respect to lessors—a separate class of parties protected by the statute.

**3.** *See* Gerstell & Hoff-Patrinos, *Aviation Financing Problems Under Section 1110 of the Bankruptcy Code,* Am.Bankr.L.J. 1, 24–25 (1987) (noting that at the time of the enactment of § 1110's predecessors, "there already was a well developed body of law limiting the conditional sales priority to true purchase-money financing").

**378**

The distinction Pan Am would draw, based on legislative history, between sale-leasebacks and conventional leases would generate numerous additional issues that could not be resolved by that legislative history. In the future, there would likely be litigation on whether the words Pan Am hopes to read into the statute through references to selected legislative history limit the protection of § 1110 to lessors of brand new equipment, lessors of equipment new to the debtor airline, lessors of equipment new to the debtor airline and also new to any predecessor of the debtor airline, *see Braniff,* 110 B.R. at 985, or some other category.[4] In addition, it would be unclear whether the statute applies to lease renewals if the equipment was new to the airline at the beginning of the initial lease term.[5] As mentioned, Pan Am concedes for purposes of this motion that § 1110 applies to leases of used equipment so long as that equipment is new to the airline. Yet this concession itself does not seem to arise from anything in the legislative history. In fact, although the issue was not treated by the Second Circuit, it appears that the transaction analyzed by the Court in *Air Vermont,* and found to be within the scope of § 1110, involved a used aircraft. *Air Vermont,* 761 F.2d at 130 (conditional sale contract dated April 27, 1982 for 1977 Piper Navajo aircraft). However, if, for example, an airline desires to continue operating Boeing 727's while awaiting delivery of new replacement aircraft that comply with new noise regulations, *see* The Airport Noise and Capacity Act of 1990, Pub.L.No. 101–508, §§ 9301–09 (Nov. 5, 1990) (requiring Secretary of Transportation to implement new regulations "including the phase-out and non addition of Stage 2 aircraft"), and would like to finance the newer aircraft in part through a sale-leaseback of the older planes, there is no principled distinction between a lease that involves the used aircraft previously owned by the airline, and a transaction in which the airline simply adds the step of trading its planes for identical used equipment, or similar used equipment such as DC–9's, controlled by an airline broker or owned by another airline interested in doing the same type of transaction. In cases such as this where the legislative history appears to reflect many seemingly different but consistent goals, courts should be reluctant to rewrite the words of a statute unless the plain meaning of those words leads to a result clearly contrary to Congress' expressed intention. Otherwise, the benefit sought to be achieved by a statute like § 1110—the prospect of a quick and predictable remedy that encourages potential financers to be forthcoming—will be lost in a miasma of potential litigation. Here, the best rule of law may be a rule of thumb, with protection for all transactions that meet the statutory requirements Congress itself imposed. "[T]his is a case for applying the canon of construction of the wag who said, when the legislative history is doubtful, go to the statute." *Greenwood v. United States,* 350 U.S. 366, 374, 76 S.Ct. 410, 414, 100 L.Ed. 412 (1956) (Frankfurter, J.).

Including all lessors within the scope of § 1110 would certainly not create an absurd or even unreasonable result. In fact, it is directly consistent with Congress' stated policy of increasing capital availability at the lowest possible cost. *See Seidle v. GATX Leasing Corp.,* 778 F.2d 659, 663 (11th Cir.1985) ("Congress intended that section 1110 encourage *new financing* of ... airplanes.") (emphasis added). That stated legislative purpose is consistent with Congress' ultimate goal of fleet moderniza-

**4.** *See* Goldman, Album & Ward, *Repossessing the Spirit of St. Louis: Expanding the Protection of Sections 1110 and 1168 of the Bankruptcy Code,* 41 Bus.Law. 29, 53–54 (1985) (suggesting that post-acquisition sale-leaseback transactions generally should not qualify for § 1110 protection, but that the section should apply if the aircraft was owned by the airline only during the 90–day period in which the tax laws permit a lessee to transfer the benefits of an investment tax credit).

**5.** *See* Giddens & Schick, *Section 1110 of the Bankruptcy Code: Time for Refueling?,* Am. Bankr.L.J. 109, 123, 128 n. 56 (1990) (suggesting that "if lease renewals are contemplated at the commencement of a lease of equipment that the airline did not previously possess, then the renewals should be afforded the protection of § 1110").

tion. *See In re Air Vermont,* 761 F.2d at 132 ("Congress did intend to extend extraordinary protection *to financiers of aircraft* in order to encourage investment in new equipment for air carriers.") (emphasis added). Although a "lessor" that leased new equipment to an airline in reliance on the statute would directly further Congress' goal, a lessor who purchased and then leased an airline's existing equipment also would further that goal, albeit indirectly, by freeing up the equity in the airline's primary existing asset, its equipment fleet. A sale-leaseback benefits the lessor by allowing it to take advantage of tax deductions that may be unavailable to the airline. The lessor also can anticipate some future return from the aircraft's residual value after expiration of the lease. *See generally* Kruft, *Leveraged Aircraft Leases: The Lender's Perspective,* 44 Bus.Law. 737, 738 (1989). Because of these benefits, a lessor in a sale-leaseback transaction is often an airline's cheapest source of low cost financing for fleet modernization. Moreover, besides using what is likely to be an airline's least expensive source of capital—its own—a sale-leaseback enables the airline to retain use of existing equipment and therefore continue operations during the time lag between order and delivery of new equipment.

Sale-leaseback transactions of the type and complexity in which Pan Am engaged may not have been directly contemplated at the time of the statute's enactment, nor explicitly mentioned in the legislative history,[6] and may or may not have been a relatively innovative technique in 1957 and 1977, when the statutes were enacted. *Contrast In re PCH Assocs.,* 804 F.2d 193, 200 (2d Cir.1986) (describing sale-leasebacks as a " 'relatively modern, and clever, structure of financing.' ") (citation omitted) *with Sun Oil Co. v. C.I.R.,* 562 F.2d 258, 268–69 (3d Cir.1977) ("we recognize that sale-leaseback arrangements play a useful and accepted role in our economy"); *see*

*also Yorkshire Ry. Wagon Co. v. Maclure,* 21 Ch.D. 309, 319 (1882) (treating sale-leaseback of "locomotives and wagons" as bona-fide transaction). However, because Congress's broad purpose in enacting both § 116(5) of the Act and § 1110 of the Code was to increase the availability of low cost capital in order to facilitate fleet modernization, there is no clear evidence that Congress intended to limit the benefits of that section to lessors of newly acquired equipment. Congress could have accomplished its goals in many ways, for example by providing protection to any creditor of an airline, or by limiting the protection to lessors of newly acquired equipment; it could also have helped the aircraft manufacturing industry by providing protection only to lessors of new equipment manufactured in the United States. For reasons it deemed sufficient, Congress chose simply to provide protection to a "lessor" without restriction and "whether as trustee or otherwise," so long as the lease involved "aircraft, aircraft engines, propellers, appliances, or spare parts, as defined in section 101 of the Federal Aviation Act of 1958," and so long as the equipment was leased to an "air carrier operating under a certificate of convenience and necessity issued by the Civil Aeronautics Board." 11 U.S.C. § 1110(a).

Pan Am argues that this interpretation of § 1110 would allow parties that are in substance non-purchase money secured lenders to receive the protection of § 1110 by doing little more than using the word "lease" in their transactional documents. Yet a court that applies the provisions of the Code to a set of facts must always look beyond the form of a transaction to its substance, *Pepper v. Litton,* 308 U.S. 295, 305, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939), a feat that can be accomplished with minimum time and effort here. As one pair of commentators have noted:

"The factor of economic ownership reveals the superficiality of any resemblance

---

**6.** Congress was certainly familiar with sophisticated leveraged lease transactions. *See* H.R. Rep. No. 595, 95th Cong., 1st Sess. 405, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6361 (stating that § 1110 applies with

equal force whether "the debtor has granted the security interest to the financer or if the debtor is leasing equipment from a financer that has leveraged the lease and leased the equipment subject to a security interest of a third party").

**380**

between the sale-leaseback transaction and a secured loan. Where the resulting lease is a true lease, a genuine change in ownership, evidenced by a transfer of residual risk, has taken place."

Gerstell & Hoff–Patrinos, *Aviation Financing Problems Under Section 1110 of the Bankruptcy Code*, Am.Bankr.L.J. 1, 25 (1987). In drafting § 1110, Congress was keenly aware of the Uniform Commercial Code's distinction, *see* § 1–201(37) (McKinney's 1991), between true leases and "leases that are merely disguised security agreements," H.R.Rep. 595, 95th Cong., 1st Sess. at 240, 1978 U.S.Code Cong. & Admin.News 6199, and a court can certainly conduct such an analysis in any proceeding to determine whether a "lease" claiming § 1110 protection is in fact a loan. *See In re PCH Associates*, 804 F.2d at 199–200 (ground lease with initial term of 33 years, renewable for an additional 165 years, was in substance a loan transaction rather than bona fide lease within the meaning of § 365); *In re Chateaugay Corp.*, 102 B.R. 335, 343 (Bankr.S.D.N.Y.1989) (status of sale-leaseback under Code depends on "whether the leaseback actually transfers the normal risks and responsibilities of lessor status"). Because Judge Blackshear reserved decision on whether certain leases between Pan Am and others were in fact true leases, *see* Order ¶ 10, that issue is not presented here.

Neither the words and structure of the statute, nor the legislative history of either § 1110 or that section's Bankruptcy Act predecessor, indicate that including all lessors within the protection of § 1110 would produce a result "demonstrably at odds with the intention of its drafters." *Ron Pair Enterprises*, 109 S.Ct. at 1031. If the lease is a true lease, rather than a disguised loan, and meets all other elements of the statute—*e.g.* qualified equipment, qualified air carrier, repossession clause in lease—the lessor is protected by § 1110. To the extent this decision conflicts with the recent bench decision of Judge Balick of the Bankruptcy Court for the District of Delaware, I respectfully disagree with the analysis and application of the legislative history in that case. *See* Transcript, *In re*

*Continental Airlines, Inc.*, 123 B.R. 713 (Bankr.D.Del.1991), *appeal pending, In re Continental Airlines, Inc.*, No. 91–58 (RSG) (D.Del.).

Paragraph 5 of the Bankruptcy Court's order is affirmed.

SO ORDERED.