**In re PAN AM CORPORATION, et al., Debtors.**

**No. 91 Civ. 1656 (MBM).**

United States District Court, S.D. New York.

Aug. 16, 1991.

Victoria A. Cundiff, Milgrim Thomajan & Lee P.C., New York City, for the Official Committee of Unsecured Creditors.

John I. Karesh, Jill Levi, Feltman, Karesh, Major & Farbman, New York City, for Greyhound Financial Corp., Westinghouse Credit Corp., Aerocar Aviation Corp., Aeron Aviation Corp., PKFinans Intern. Corp., and De Nationale Investeringsbank N.V.

## OPINION AND ORDER

MUKASEY, District Judge.

Pan Am Corporation, *et al.*, debtors and debtors in possession (collectively "Pan Am") filed a petition for reorganization under Chapter 11 of the Bankruptcy Code (the "Code") on January 8, 1991. On February 22, 1991, Pan Am moved in the Bankruptcy Court for the Southern District of New York, by order to show cause, for an order authorizing it to cure defaults in certain transactions pursuant to § 1110 of the Code and declaring that certain other transactions are not covered by § 1110. After notice, and a hearing on March 7, 1991, the Bankruptcy Court, Hon. Cornelius Blackshear, Bankruptcy Judge, entered an 11 paragraph written order dated March 8, 1991 (the "Order"), granting in part and denying in part Pan Am's motion, and reserving decision on unresolved issues—in particular whether certain leases were actually loan transactions rather than true leases. The Order was followed by a written opinion. *See In re Pan Am Corp.*, 124 B.R. 960 (Bankr.S.D.N.Y.1991).

Several paragraphs of the Order concerning the applicability of § 1110 to certain transactions are currently on appeal. Earlier, on expedited appeal by the debtor, I affirmed paragraph 5 of the Order that had held that non-acquisition sale-leaseback transactions are not disqualified from the protection of § 1110 solely because they do not involve the acquisition of equipment new to the debtor. *In re Pan Am Corp.*, 125 B.R. 372 (S.D.N.Y.), *aff'd per curiam.*, 929 F.2d 109 (2d Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2248, 114 L.Ed.2d 488 (1991). Because the remaining issues on appeal present discrete legal questions, those appeals will be decided seriatim as

the parties' briefs become fully submitted. The subject of this opinion is the appeal of paragraph 9 of the Order by The Official Committee of Unsecured Creditors of Pan Am Corp. (the "Committee"). In relevant part, that paragraph stated:

> *Order ¶ 9:* "The objections of the Creditors' Committee to the effect that ... provisions in Section 1110 Transaction Documents providing for pooling, interchange or similar arrangements ... are *ipso facto* not entitled to the protection of Section 1110 are overruled."

In substance, the issue before me is whether a transaction, in which a lessor undertakes to "lease" equipment to the debtor, automatically falls outside the protection of § 1110 because the debtor has the option of returning similar equipment of similar value and utility to the lessor at the end of the lease term instead of the particular piece of equipment originally leased. The Committee argues also that Judge Blackshear abused his discretion by not ordering all creditors to proceed in the Bankruptcy Court before repossessing property subject to § 1110. For the reasons set forth below, paragraph 9 of the Order is affirmed. Also, Judge Blackshear did not abuse his discretion by refusing to issue an order channelling all repossession actions to the Bankruptcy Court.

## I.

The Bankruptcy Court's decision turns on a question of law, subject to *de novo* review. *In re Ionosphere Clubs, Inc.,* 922 F.2d 984, 988 (2d Cir.1990); *Truck Drivers Local 807, etc. v. Carey Transp., Inc.,* 816 F.2d 82, 88 (2d Cir.1987). Judge Blackshear did not make any factual findings regarding any challenged transactions. Rather, he made a legal determination—that lease transactions do not lose the protection of § 1110 simply because the debtor has the right to return similar equipment to the lessor upon the expiration of a lease or upon default. The appellees

on this issue are the lessors in the challenged transactions. Although none of the applicable documents are part of the appellate record, the parties have described the challenged transactions as being of two principal types.[1] First are transactions in which lessors provide only aircraft engines, and not airframes. Second are transactions in which lessors provide both engines and airframes—*i.e.* complete, usable aircraft. The Committee argues that neither transaction is protected by § 1110 because both permit Pan Am to move "leased" engines freely from airframe to airframe during the "lease" term, *and* to return engines at the end of the term other than the particular engines originally provided. It appears that many of the leases provide for a compensating cash payment when there is a material difference between the value of the original engine and the one actually returned. (Committee's Memorandum of Law at 4; Appellees' Memorandum of Law at 14) Thus, at the end of the term, the lessor of an engine or of a complete aircraft will receive back the original engine only if Pan Am finds it convenient to return that engine. The provision that allows Pan Am to switch engines during the lease term and return a different engine at the end of the term, or upon earlier termination of the lease, will be referred to as a pooling/interchange provision.

The Committee does not argue any inference adverse to the creditors from the pooling/interchange provisions that allow airlines to switch engines between airframes *during the lease term.* (*See* Committee's Reply Memorandum at 8 & n. 2) They appear to agree with appellees that as a practical matter such switching is necessary because it allows the airline to install similar engines on an airframe when the engines already installed become damaged or require maintenance or overhaul work. Without this flexibility, airlines would have to remove an entire aircraft from service in

---

1. A list of challenged transactions appears in the Committee's Amended Notice of Objection filed with the Bankruptcy Court on March 5, 1991. Specifically, the Committee objects to Transactions 1–47, 50–52, 54, 55(A–E), 59, 68–70, 73B, 84–94, 95A, 95B, 96–101, 103, 104, 109, 110 and 118A, described in the February 22, 1991 "Declaration of Joan Fabio in Support of Debtors' [§ 1110] Motion ..."

order to perform work on a single engine. But the Committee does ask me to find legal significance in the pooling/interchange provisions that give the debtor the right to return substituted engines to the lessor at the end of the term, sometimes giving or receiving also a compensating cash payment. (*See* Committee's Reply Memorandum at 8) The Committee contends that this pooling/interchange provision removes the transactions from the protection of § 1110. The Committee argues that for a lease to come within the protection of § 1110, the lessor must have the right to receive at the end of the term the particular engines originally provided.

Section 1110 of the Bankruptcy Code provides in relevant part:

> (a) The right of a secured party with a purchase-money equipment security interest in, or a lessor or conditional seller of, whether as trustee or otherwise, aircraft, aircraft engines, propellers, appliances, or spare parts, as defined in section 101 of the Federal Aviation Act of 1958, ... that are subject to a purchase money equipment security interest granted by, leased to, or conditionally sold to, a debtor that is an air carrier operating under a certificate of convenience and necessity issued by the Civil Aeronautics Board ... to take possession of such equipment in compliance with the provisions of a purchase money equipment security agreement, lease, or conditional sale contract, ... is not affected by section 362 or 363 of this title or by any power of the court to enjoin such taking of possession, unless—
>
> (1) before 60 days after the date of the order for relief under this chapter, the trustee, subject to the court's approval, agrees to perform all obligations of the debtor that become due on or after such date under such security agreement,

lease, or conditional sale contract, as the case may be; and

> (2) any default, other than a default of a kind specified in section 365(b)(2) of this title, under such security agreement, lease, or conditional sale contract, as the case may be—
>
> (A) that occurred before such date is cured before the expiration of such 60–day period; and
>
> (B) that occurs after such date is cured before the latter of—(i) 30 days after the date of such default; and (ii) the expiration of such 60–day period.
>
> ....

11 U.S.C. § 1110 (1991).

As I characterized § 1110 in my prior opinion: "[o]n its face, the statute is unambiguous. To the extent a party is a true lessor and otherwise qualifies under the statute, it is entitled to the 'extraordinary protection' of § 1110." 125 B.R. at 374 (quoting *In re Air Vermont, Inc.*, 761 F.2d 130, 132 (2d Cir.1985)). "If the lease is a true lease, rather than a disguised loan, and meets all other elements of the statute—*e.g.* qualified equipment, qualified air carrier, repossession clause in lease—the lessor is protected by § 1110." 125 B.R. at 380. In that opinion, I declined to read into § 1110 the unstated requirement that a lease involve the acquisition of equipment new to the airline.

That same reasoning applies to the Committee's argument that, with respect to leases, § 1110 contains an unstated requirement that the lease provide for the return of the original equipment at the end of the term. The statute does not contain that requirement and I decline to add an additional condition by judicial fiat. Nor does the statute contain any such requirement with respect to the other kinds of transactions protected by § 1110—purchase money equipment security transactions or conditional sales.[2] With respect to

---

2. The Committee acknowledges that no transactions in the form of a Purchase Money Equipment Security Interest are subject to this appeal. (*See* Committee Reply Memorandum at 1 n. 1) Because the documents relating to the challenged transactions are not part of the appellate record, it is unclear whether any of the chal-

lenged transactions are conditional sale transactions. Because the Uniform Commercial Code treats a conditional seller the same as a secured party with a purchase money security interests, *see* U.C.C. § 9–107, it appears that all of the challenged transactions are leases. In any case, to the extent the Committee challenges condi-

the lessor's right to repossess the equipment upon default, the statute provides only that the lessor's right to repossess qualified equipment "in compliance with the provisions of a ... lease ... is not affected by [§§] 362 or 363 [of the Code] or by any power of the court to enjoin such taking of possession ..." There is no requirement in the statute that the repossession clause relate to the specific item originally provided.

In my earlier opinion, I recognized that only true leases, rather than disguised loans, are protected by the statute. Seizing on this distinction, the Committee argues that pooling/interchange provisions are incompatible with the concept of true leases. The Committee describes a lease as nothing more than a "bailment for hire," which certain authorities have described as an arrangement in which an owner delivers personal property to another for a fixed term while maintaining a reversionary interest in the particular property delivered. (*See* Committee's Memorandum of Law at 5 (*citing Home Ins. Co. v. Board of County Com'rs*, 97 N.E.2d 231, 233, 88 Ohio App. 91 (Lorain Co. 1949), *appeal dismissed*, 92 N.E.2d 609, 153 Ohio St. 538 (1950)))

Although true leases might usually require that the lessee return the original property to the lessor at the end of the lease term, there is no support for the proposition that true leases must provide for the return of the original property. No authority cited by the Committee supports the proposition that an agreement called a "lease" is never a bona-fide lease if it permits the lessee to return different equipment upon the expiration or earlier termination of the lease. The issue of whether a lease is a "true" lease or a disguised security interest is fact dependent. *International Trade Administration v. Rensse-*

*laer Polytechnic Institute*, 936 F.2d 744, 751 (2d Cir.1991). Courts must examine the "economic substance of the transaction rather than 'the locus of title, the form of the transaction, or the fact that the transaction is denominated as a "lease," ' ". *In re PCH Associates*, 804 F.2d 193, 199 (2d Cir.1986) (*citing* S.Rep. No. 989, 95th Cong., 2d Sess. 64, *reprinted* in 1978 U.S.Code Cong. & Admin.News 5787, 5850.); *see also In re The Answer—The Elegant Large Size Discounter, Inc.*, 115 B.R. 465, 469 (Bankr.S.D.N.Y.1990) ("significant factor in determining whether or not a lease or a security agreement is involved is the objective intention of the parties"); *In re Air Vermont, Inc.*, 44 B.R. 440, 443 (Bankr.D.Vt.1984) ("[w]hether an agreement is a true lease or a security agreement is determined by.... look[ing] to the contents of the document and to the factual setting of the transaction, ... as well as to the subsequent treatment of the agreement by the parties") (citations omitted).

As adopted in New York,[3] the Uniform Commercial Code provides that:

[w]hether a lease is intended as security is to be determined by the facts of each case; *however, (a) the inclusion of an option to purchase does not itself make the lease one intended for security,* and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security.

Uniform Commercial Code § 1–201(37) (McKinney's 1964 & 1991 Supp.) (emphasis added). Essentially, the right of the debtor to substitute a similar engine upon the expiration of the lease is nothing more than an option to purchase the original engine

---

tional sale transactions, the legal issue on appeal is identical to that relating to leases—whether the presence of a pooling/interchange provision automatically places the transaction outside the protection of § 1110.

**3.** It appears that many of the challenged transactions are governed by New York law. (*See* Appellees' Memorandum of Law at 23) In any

case, the New York definition of security interest is consistent with the official text of the Uniform Commercial Code. The official text of § 1–201(37) provides that "A transaction does not create a security interest merely because it provides that.... (c) the lessee has an option to renew the lease or to become the owner of the goods[.]"

for the consideration of a similar engine. When the lease agreement provides for compensating cash payments between the parties in order to account for any differences between the value of the original engine and the value of the substituted engine, that cash payment becomes part of the purchase transaction. Under the Uniform Commercial Code, the existence of a purchase option does not automatically distinguish a true lease from a financing lease. Moreover, courts have held that a document containing an option that allows the user to purchase a piece of equipment only at its fair market value is presumptively a true lease. *In re Celeryvale Transport, Inc.*, 822 F.2d 16, 18 (6th Cir. 1987). Therefore, the debtor's right to substitute equipment and pay or receive compensating value does not in itself make the challenged transactions disguised loans rather than true leases.

A pooling/interchange provision may be relevant in determining if a specific transaction is a disguised loan, particularly if, at the time of contracting, the agreement in question provided that the debtor could substitute virtually worthless equipment for valuable equipment at the end of the term. *See Air Vermont*, 44 B.R. at 445 ("to determine whether an option to purchase is for nominal consideration, the option price should be compared with the fair market value of the subject matter, not as of the time the option is to be exercised, but as of the formation of the agreement"). In such a case, the pooling/interchange provision might be equivalent to a nominal consideration purchase option. However, the status of any of the more than 80 challenged transactions must be decided by the Bankruptcy Judge on a case-by-case basis, if necessary, by holding evidentiary hearings. *See In re Leasing Consultants, Inc.*, 486 F.2d 367, 373 (2d Cir.1973) (remanding case to district court for evidentiary hearing to determine whether lease instruments "were in fact 'true leases' or lease devices intended as security.").

Judge Blackshear explicitly left open the question of whether any particular transactions characterized as "leases" were actually "intended as security" under the Uniform Commercial Code.[4] *See* 124 B.R. at 973–74. In particular, he allowed lessors to repossess equipment, but warned that:

> such parties act at their peril if their alleged leases are not true leases. If a lessor so acts and it is subsequently determined that the transaction was other than a lease protected by section 1110, such party will be responsible for the return of the collateral or proceeds, damages, costs etc.

*Id.* at 974. He also suggested that any party in doubt as to the status of a particular transaction commence an adversary proceeding requesting a declaratory judgment. *Id.* That is sensible advice. For purposes of this appeal, it is sufficient to hold, as did Judge Blackshear, that the debtor's right to substitute equipment at the end of the term does not *ipso facto* take those transactions outside the protection of § 1110.

## II.

The Committee argues also that even if the challenged transactions are covered by § 1110, the Bankruptcy Court abused its discretion by refusing to issue an order directing that creditors wishing to repossess property subject to § 1110 pursue their actions solely in the Bankruptcy Court. Although that subject was not dealt with in the March 8 Order, the issue was addressed by the Bankruptcy Court at the March 7 hearing (*see* Transcript at 31–35), and the Committee's request was implicitly rejected in paragraph of 2 of the Order which stated that "[t]he Section 1110 Transactions are not entitled to the protection of Section 1110." In determining which issues are properly before it on appeal, the district court may scan the record

---

**4.** The documents pertaining to the challenged leases have not been included in the appellate record and I express no opinion on whether any specific transaction is or is not a true lease covered by § 1110. This appeal concerns the strictly legal question of whether the presence of a pooling/interchange provision automatically takes a transaction outside the protection of § 1110.

to determine what the Bankruptcy Court has in fact decided. *See Raine v. Lorimar Prods., Inc.,* 71 B.R. 450, 452 (S.D.N.Y.1987). Before the Bankruptcy Court, the Committee requested an order "direct[ing] aircraft financiers seeking to repossess equipment under color of Section 1110 to present their claims to [the Bankruptcy Court] for determination." (*See* Reply Memorandum of the Official Unsecured Creditors Committee at 18)

■ Judge Blackshear's refusal to issue the requested order will be treated as a refusal to grant a preliminary injunction. Considering that "finality" is a more flexible concept in bankruptcy proceedings than elsewhere, *see In re Johns–Manville Corp.,* 920 F.2d 121, 126 (2d Cir.1990), the issue is properly before me on appeal pursuant to 28 U.S.C. § 158(a) as a final order of the Bankruptcy Court. However, the decision being appealed—the refusal to issue an order that is the equivalent of a preliminary injunction—"rests in the discretion of the [bankruptcy] court which, absent an abuse of discretion, will not be disturbed on appeal." *Reuters Ltd. v. United Press Int'l, Inc.,* 903 F.2d 904, 907 (2d Cir.1990). The bankruptcy court's discretion is exceeded " 'when the decision reached is not within range of decision making authority a reviewing court determines is acceptable for a given set of facts.' " *Id.* (*quoting Stormy Clime Ltd. v. ProGroup, Inc.,* 809 F.2d 971, 974 (2d Cir.1987)).

The Committee argues, as a general matter, that permitting creditors to repossess equipment protected by § 1110 without oversight by the Bankruptcy Court might harm the debtor or others in the event that repossession affects other equipment. They argue also that unless all actions for repossession take place in the Bankruptcy Court, there is a danger that other courts might issue orders permitting parties to take possession or otherwise interfere with property in which they have no interest, or that different courts will issue conflicting decisions concerning whether a specific piece of property is covered by a § 1110. The Committee cites as an example the scenario in which a state court issues a replevin order allowing a creditor to seize an entire aircraft although that creditor has no rights with respect to some of the engines.[5]

■ The issue before me is not whether a Bankruptcy Court may order that all parties seeking to repossess any equipment under color of § 1110 do so under that Court's auspices. Rather, the issue is whether Judge Blackshear abused his discretion by *not* issuing such an order. In general, a bankruptcy court has the power under § 105(a)[6] to enjoin proceedings that affect property of the estate and channel claims against property of the estate into the bankruptcy forum. *See MacArthur Co. v. Johns–Manville Corp.,* 837 F.2d 89, 93–94 (2d Cir.), *cert. denied,* 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988). However, considering that § 1110 explicitly states that the right of a lessor to repossess equipment "*is not affected* by section 362 or 363 of this title or *by any power of the court* to enjoin such taking of possession" (emphasis added), it is unclear whether Judge Blackshear even had the power to issue the type of general order covering all challenged transactions which the Committee claims he was required to issue. Presumably, in the event Pan Am believes that the action of any particular creditor to repossess property under the color of § 1110 adversely affects *property not covered by* that section, it could seek an injunction in

---

5. The Committee claims that, shortly after the Order was issued, this actually happened. (*See* Committee's Memorandum of Law at 15–16) For their part, appellees dispute both the Committee's version of the facts and the harm allegedly suffered by the debtor. (*See* Appellees' Memorandum of Law at 34) In any case, no particular transaction or dispute is before me and I therefore decline to consider any events subsequent to the Order. The sole issue before me is whether Judge Blackshear abused his discretion by refusing to channel *all* repossession actions into the Bankruptcy Court.

6. In relevant part, § 105(a) provides that: "[t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."

the Bankruptcy Court to protect the rights of all parties.

The propriety of any specific injunction or order relating to a repossession action is not before me. The risk of inconsistent adjudications or damage to the estate was speculative—at least as to the more than 80 transactions challenged in gross by the Committee—when Judge Blackshear denied the request for an order enjoining all § 1110 creditors from repossessing their equipment outside the bankruptcy court. Therefore, such denial was not an abuse of discretion.

For the above reasons, paragraph 9 of the Order is affirmed in all respects.

SO ORDERED.