**In re PAN AM CORPORATION, et al., Debtors.**

**Bankruptcy Nos. 91 B 10080 (CB)–91 B 10087 (CB).**

United States Bankruptcy Court, S.D. New York.

March 18, 1991.

Cleary, Gottlieb, Steen & Hamilton by George Weisz, Jerome E. Hyman, Thomas J. Maloney, James W. Pharo, Robert P. Davis, Howard Zelbo, New York City, for debtors.

Milgrim, Thomajan & Lee by Peter D. Wolfson, New York City, for Creditors Committee.

Simpson Thacher & Bartlett by Myer O. Sigal, Jr., Mark J. Thompson, Steve M. Chaiken, Brian Trust, Daniel Sullivan, New York City, for AI Leasing II, Inc., Airbus Service Comp. Inc., CIT Group/Equipment Financing, Inc. and CIT Leasing Corp.

Weil, Gotshal & Manges by Marvin E. Jacob, New York City, for Evergreen Intern. Airlines, Inc. and Evergreen Ventures, Inc.

Weil, Gotshal & Manges by Bruce R. Zirinsky, New York City, for General Elec. Capital Corp., Eastern Airlines, Inc., Coblestone Corp. and Wilmington Trust Co.

Cohen Weiss & Simon by Richard Seltzer, New York City, for Airline Pilots Ass'n.

Wachtell, Lipton, Rosen & Katz by Amy R. Wolf, New York City, for United Technologies Corp. and Affiliates.

King & Spalding by Kathrine A. McLendon, Atlanta, Ga., for British Aerospace, Inc. and Jet Acceptance Corp.

Lord Day & Lord, Barrett Smith by William R. Brennan, William C. Clarke, New York City, for USAir, Inc., America West Airlines, Inc., Northwest Airlines, Inc. and American Airlines, Inc.

Walter, Conston, Alexander & Green, P.C. by Stephen H. Gross, New York City, for GATX, P.S. Group Inc., U.S. Airlease, Inc., Airlease Ltd., Intern. Air, Grand Central Partners (Nos. 1, 2 & 3), I.A.L. 361 Inc.

Shearman & Sterling by David L. Bleich, Veronica A. DeBerardine, New York City, for Citibank, N.A. and Citicorp North America, Inc.

Rosenman & Colin by Jeff J. Friedman, Maria Echaveste, New York City, for Unibank A/S, Integrated Aircraft Leasing

Corp., (I, II & II), Nat. Westminster Bank, USA, and C & E Acquisition Corp.

Thelen, Marrin, Johnson & Bridges by Jonathan E. Polonsky, New York City, for Wells Fargo Bank.

Bruce H. Roswick by Bruce H. Roswick, New York City, for First Fidelity Bank.

Breed Abbott & Morgan by Daniel R. Goodman, New York City, for C. Itoh & Co., Ltd., Nissho Iwai, Corp., NMB Lease NV and Orix Corp. Citicorp Center.

Leboeuf, Lamb, Leiby & Macrae by Ira A. Reid, New York City, for U.S. Trust Co. of New York.

Reed Smith Shaw & McClay by David Ziegler, Pittsburgh, Pa., for Mellon Financial Services Corp. # 3.

Jacqlyn D. Stein by Jacqlyn D. Stein, Pittsburgh, Pa., for Mellon Bank.

Winthrop, Stimpson, Putnam & Roberts by Robert W. Gray, Eloise L. Morgan, New York City, for Bank of New York, Aeronautics I. Inc., and Aeronautics Four–Seven A. Inc.

Haight, Gardner, Poor & Havens by Jon Yard Arnason, New York City, for US Concord, Inc., LDI Financial Services Corp., Progress Leasing Corp., PLC Leasing Corp.

Feltman, Karesh, Major & Farbman by John I. Karesh, New York City, for Westinghouse Credit Corp., Greyhound Financial Corp., De Nationale Investeringsbank N.V., Credit Lyonnais/PK AIRFRANCE, PK Finans Intern. Corp., and Aerocar Aviation Corp.

Olwine, Connelly, Chase, O'Donnell & Weyher by Grace M. Healy, New York City, for United Aviation Services, Inc. and UAS Leasing I, Inc.

Mudge Rose Guthrie Alexander & Ferdon by David M. Friedman, New York City, for Avions de Transport Regional, G.I.E., et al.

Chadbourne & Parke by Kenneth P. Coleman, New York City, for First Sec. Bank of Utah, N.A.

Skadden, Arps, Slate, Meagher & Flom by George A. Zimmerman, New York City, for Polaris Aircraft Income Fund II.

Scheffler, Karlinsky & Stein by Robert P. Stein, New York City, for NCNB Nat. Bank of North Carolina, Inc.

Seward & Kissel by Ronald L. Cohen, New York City, for Partnairs US Leasing, Inc.

Hughes, Hubbard & Reed by David M. LeMay, New York City, for IBJ Schroder Leasing Corp.

Debevoise & Plimpton by Peter L. Borowitz, New York City, for Royce Credit Corp. & Rolls Royce Holdings Inc.

Volpe, Boskey and Lyons by Bennett Boskey, Washington, D.C., for American Ass'n of Equipment Lessors.

Pryor & Mandelup by Robert L. Pryor, Mineola, N.Y., for Sea/Air/Ground Leasing Corp.

Zalkin, Rodin & Goodman by Andrew D. Gottfried, New York City, for Boeing Co.

Perkins Coie by Michael Havers, Seattle, Wash., for Pacific Harbor Capital, Inc. and GM Aviation Services, S.A.

Siegel, Sommers & Schwartz by Lawrence C. Gottlieb, New York City, for United Aviation Services.

## DECISION ON DEBTORS' MOTION PERTAINING TO SECTION 1110 OF THE BANKRUPTCY CODE

CORNELIUS BLACKSHEAR, Bankruptcy Judge.

### THE MOTION

Pan Am Corporation *et al.* (the "Debtors") have filed a motion seeking a determination as to the reach of section 1110 of the Bankruptcy Code (the "Code"). Specifically, they seek a Court Order:

(a) declaring that the Debtors' non-acquisition sale leaseback transactions (the "Sale–Leasebacks") are not covered by Section 1110;

(b) declaring that certain of the Debtors' leases are not covered by section 1110 because they did not enable the Debtors to newly-acquire aircraft but rather were subsequently negotiated renewals or extensions of existing leases;

(c) declaring that certain aircraft are not covered by section 1110 because they were not acquired by an air-carrier that had the necessary certificate of convenience and necessity required for coverage under section 1110;

(d) declaring that section 1110 does not apply to certain transactions with General Electric Capital Corporation ("GECC") in which GECC does not have a purchase money equipment security interest ("PMESI") in certain aircraft and equipment owned by the Debtors;

(e) declaring that certain loan transactions with United Technologies Corporation and UT Finance Corporation (collectively, "UT") are not covered by section 1110 because UT does not have a PMESI in the engines serving as collateral for these loans;

(f) authorizing the Debtors to cure defaults relating to those transaction that the Debtors have preliminary determined are covered by section 1110 (the "Section 1110 Transactions"), subject to the Debtors' express reservation of its rights;

(g) declaring that cure payments by section 1110 do not include penalties, default interest, attorneys' fees and other payments owed by Debtors according to the terms of the relevant agreements as a result of Debtors' default under those agreements and declaring that Debtors are entitled to a credit for any cash deposit;

(h) declaring that all transactions concerning the use and/or possession of aircraft and related equipment to which any Debtor is a party, other than those transactions to which the Debtors concede are 1110 transactions, and precluding any party that fails to file a timely objection to this motion from claiming that section 1110 applies to any transaction; and

(i) such other relief as the Debtors may seek by proposed order from this Court as warranted by the Debtors' financial condition at the end of the 60–day period provided in section 1110.

At a hearing, held on March 7, 1991, this Court heard oral argument from the Debtors in support of their motion, from those parties in support of the Debtors' motion and from those parties opposing the Debtors' motion. This Court issued an oral ruling as to part of the Debtors' motion and reserved the right to issue a written decision. The portion of the Debtors' motion which questioned what "cure" under section 1110 entails was left for another day. In the interim, the Debtors were directed to make timely cure payments consisting of those amounts not in dispute.[1] This Court's oral ruling addressed the applicability of section 1110 to:

(a) sale-leaseback transactions;

(b) lease extensions and renewals;

(c) leases with non-certified Debtors;

(d) the PMESI transaction entered into with GECC;

(e) the equipment switching/pooling arrangements.

In addition this Court also discussed what is referred to as the "True Lease" issue. This decision memorializes the aforementioned oral ruling rendered on March 7, 1991.

## BACKGROUND

On January 8, 1991 (the "Petition Date") the Debtors filed their respective petitions for reorganization under Chapter 11 of the Code. By an order dated January 8, 1991, this Court approved the joint administration of the Debtors chapter 11 cases for procedural purposes. The Debtors continue to manage and operate their businesses and properties pursuant to sections 1107 and 1108 of the Code.

The Debtors are part of a multinational organization that provides air transportation and transportation-related services in the United States and throughout the world. Pan Am Corporation is a holding company that directly or indirectly owns all of the issued and outstanding stock of the other Debtors, including Pan American World Airways, Inc. ("Pan Am") and Pan

---

**1.** The issues in dispute, including the attorneys' fees, penalty default interest rate, debtor-in-possession junior liens, and reservation of rights, will be addressed in the future at which point this Court will have an opportunity to fully review the relevant evidence.

Am Express ("Express"). Pan Am Shuttle, Inc. ("Shuttle"), another subsidiary of Pan Am Corporation, provides hourly shuttle service between New York City and both Boston and Washington D.C.

Pan Am currently operates a fleet of 154 jet powered aircraft. Express, which serves as a feeder-carrier for the Debtors' international routes and provides service in the United States and Europe, operates 32 commuter aircraft (collectively with the Pan Am aircraft described above, the "Aircraft"). The Debtors also own or "lease" various spare engines and spare parts (together with the Aircraft, the "Aircraft and Equipment"). The Aircraft and Equipment are the subject of leases, subleases, conditional sales agreements and security agreements (collectively the "Agreements").

Each of the Debtors presently holds one or more certificates of convenience and necessity within the meaning of section 1110 (the "Certificate"). Express did not acquire its Certificate until December 31, 1987.

### I. THE SALE–LEASEBACKS

Section 1110 of the Bankruptcy Code provides as follows:

(a) The right of a secured party with a purchase-money equipment security interest, or of a lessor or conditional vendor of, whether as trustee or otherwise, aircraft, aircraft engines, propellers, appliances, or spare parts, as defined in section 101 of the Federal Aviation Act of 1958 (49 U.S.C. 1301), or vessels of the United States, as defined in subsection B(4) of the Ship Mortgage Act, 1920 (46 U.S.C. 911(4)), that are subject to a purchase-money equipment security interest granted by, leased to, or conditionally sold to, a debtor that is an air carrier operating under a certificate of convenience and necessity issued by the Civil Aeronautics Board, or a water carrier that holds a certificate of public convenience and necessity or permit issued by the Interstate Commerce Commission, as the case may be, to take possession of such equipment in compliance with the provisions of a purchase-money equip-

ment security agreement, lease, or conditional sale contract, as the case may be, is not affected by section 362 or 363 of this title or by any power of the court to enjoin such taking of possession, unless—

(1) before 60 days after the date of the order for relief under this chapter, the trustee, subject to the court's approval, agrees to perform all obligations of the debtor that become due on or after such date under such security agreement, lease, or conditional sale contract, as the case may be; and

(2) any default, other than a default of a kind specified in section 365(b)(2) of this title, under such security agreement, lease, or conditional sale contract, as the case may be—

(A) that occurred before such date is cured before the expiration of such 60–day period; and

(B) that occurs after such date is cured before the later of—

(i) 30 days after the date of such default; and

(ii) the expiration of such 60–day period.

(b) The Trustee and the secured party, lessor, or conditional vendor, as the case may be, whose right to take possession is protected under subsection (a) of this section may agree, subject to the court's approval, to extend the 60–day period specified in subsection (a)(1) of this section.

Section 1110 relieves certain persons from the restrictions of the automatic stay and, subject to the terms of their individual agreements with the debtor, permits them to repossess aircraft and other equipment, unless the debtor to those agreements cures prepetition defaults relating to those agreements within sixty (60) days of filing for bankruptcy. The debtor must cure post-petition defaults within the later of thirty (30) days of default or sixty (60) days from the petition date.

The substantive relief provided for in section 1110 is not a new concept in bankruptcy law. Indeed, section 1110 can be traced back to section 77j of the Bankrupt-

cy Act which provided that an owner of conditionally sold or leased rolling stock could repossess the equipment from a railroad despite the commencement of a railroad reorganization case, which normally would stay such a repossession action.[2] In 1957, Congress enacted section 116(5), the predecessor statute to section 1110, extending the protection of section 77j to persons who lease to or conditionally sell to a debtor who is an air carrier.[3] In enacting section 1110, Congress adopted the provisions of section 116(5) and further extended its protection to PMESIs.

■ Section 1110 stands in stark contrast to sections 362, the automatic stay provision, and 365, the assumption or rejection of executory contracts or leases provision, of the Code. Congress obviously saw a need for this type of special legislation in order to protect certain persons who deal with air carriers. In this bankruptcy case, the Debtors seek a determination that section 1110 was extended to give this special status to only those who provide financing for the new acquisition of specified equipment. Specifically, the Debtors are of the view that the Sale–Leasebacks are not protected by section 1110.

This motion is made on the heels of the decision in the Continental Airlines, Inc. chapter 11 case wherein the bankruptcy judge squarely held that sale-leaseback transactions not involving the acquisition of new equipment did not fall within either the letter or spirit of section 1110. *In re Continental Airlines, Inc.*, 123 B.R. 713

(Bankr.D.Del.1991). Not surprisingly, this motion has garnered a host of opposition from lessors of aircraft, air-carrier equipment and other Airlines.[4]

As of the Petition Date, the Airlines were parties to numerous Sale–Leasebacks in which the Debtors "sold" Aircraft and Equipment which had been part of their fleet for many years to financiers, who then leased that same Aircraft and Equipment back to the Debtors. The Debtors did not acquire any new Aircraft and Equipment as a result of these transactions.

In asserting their claim, the Debtors posit that section 1110 is not clear on its face and mandates a review of legislative history, which the Debtors claim unequivocally demonstrates that Congress intended for this section to apply only to transactions involving a debtor's new acquisition of equipment.

As Justice Frankfurter wrote some 44 years ago, statutory construction begins with the reading of the actual words of the statute under scrutiny. Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum.L.Rev. 527, 535 (1947). Under well established canons of statutory construction, when a statute is clear on its face, it should be enforced in accordance with its terms. *United States v. Hopkins*, 853 F.2d 118, 119 (2d Cir.1988); *United States v. Payden*, 759 F.2d 202, 204 (2d Cir.1985). Courts are reluctant to sway from the clear and unambiguous provisions of a statute. The function of the courts is to interpret

---

**2.** Section 77j provided in part:

The title of any owner, whether as trustee or otherwise, to rolling-stock equipment leased or conditionally sold to the debtor, and any such owner to take possession of such property in compliance with the provisions of any such lease or conditional sale contract, shall not be affected by the provisions of this section.

41 U.S. Statutes at Large, 74th Cong., 1st Sess. § 77j at 922 (1935).

**3.** Section 116(5) provided:

Notwithstanding any other provisions of chapter X, the title of any owner, whether as trustee or otherwise, to aircraft, aircraft engines, propellers, appliances, and spare parts (as any of such are defined in the Civil Aeronautics Act of 1938, as now in effect or here-

after amended) leased, subleased, or conditionally sold to any air carrier which is operating pursuant to a certificate of convenience and necessity issued by the Civil Aeronautics Board, and any right of such owner or of any other lessor to such air carrier to take possession of such property in compliance with the provisions of any such lease or conditional sale contract shall not be affected by the provisions of Chapter X if the terms of such lease or conditional sale so provide.

**4.** America West Airlines, Inc., American Airlines, Inc., Northwest Airlines, Inc. and USAir, Inc., all represented by Lord Day & Lord, Barrett Smith, filed an amicus brief in opposition to the Debtors' motion.

and enforce the law, not create it. When a court refuses to follow the clear and unambiguous terms of a statute and instead chooses to impose its own views and modifications, it is in effect legislating.

Section 1110 clearly and unambiguously applies to "a lessor of ... aircraft." 11 U.S.C. § 1110(a). A lessor may, unless the airline cures all defaults and performs all obligations under Section 1110, "take possession of such equipment in compliance with the provisions of a ... lease...." *Id.* The terms "lease" and "lessor" are not modified or limited by the statutory language. The Debtors perceive an ambiguity in section 1110 insofar as it seems to provide for equal treatment of leases, PMESIs and conditional sales agreements. Lease transactions are entered into for a myriad of reasons; whereas for PMESIs and conditional sales the purpose is generally the same. Specifically, PMESIs and conditional sales are created for the very purpose of financing the acquisition of equipment, in this case airline equipment. On the other hand, lease transactions, which include sale-leaseback transactions, are not always a tool for financing the new acquisition of equipment. Rather, a sale-leaseback, where the air carrier sells to the lessor an aircraft that has been part of the air carrier's fleet for a substantial period of time, is a creative means of infusing working capital into the air carrier's business. Therefore, to some, there seems to exist an inconsistency in the statute since it extends equal protection to transactions which, at first blush, do not serve the same purpose. It is possible that Congress intended to extend section 1110's coverage to only those agreements relating to the new acquisition of equipment by an air carrier. But Congress did not so qualify the statute. A plain and literal reading of the statute calls for a nonrestrictive reading of the words lease and lessor.

The Second Circuit adheres to the plain meaning doctrine of statutory construction. In *California Chieftan v. Air Vermont, Inc. (In re Air Vermont, Inc.)*, 761 F.2d 130 (2d Cir.1985), when asked to interpret section 1110, the court stated that "the statute's literal meaning must be applied, and no condition of recording may be superimposed on the requirements explicitly specified in order for § 1110 to apply." *Id.* at 134; *see also, First Nat'l Bank v. Shugrue (In re Ionosphere Clubs, Inc.)*, 123 B.R. 166, 168–69 (S.D.N.Y.1991). In a more recent decision, *Maritime Asbestosis Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.)*, 920 F.2d 183 (2d Cir.1990), the Second Circuit applied a literal interpretation of section 362(h) of the Code and refused to include corporations as parties with standing to request sanctions under section 362(h) of the Code since that section only refers to "individuals" as the parties who had standing to request sanctions. A plain reading of section 1110 would dictate the terms lease and lessor be given its ordinary meaning and not be qualified in any fashion.

Courts must strive to listen to what Congress says, but, as Justice Frankfurter observed, sometimes "Congress cannot be heard clearly because its speech is muffled." Frankfurter, *supra* at 536. However, review of the legislative history of section 1110 does not give this Court reason to change its decision. The legislative history seems to suggest that section 1110 was intended to protect transactions involving the financing of new acquisitions of aircraft by a debtor. Congress refers to "financiers" and "equipment financing" throughout the House Report. However, as the court in *Braniff Inc. v. Toren (In re Braniff, Inc.)*, 110 B.R. 980, 983 (Bankr.M.D.Fla.1990) stated, Congress probably made such constant reference to the financing of equipment because it was discussing the modification of section 1110's predecessor, section 116(5) of the Bankruptcy Act, to include PMESIs which, by their very nature relate to the new acquisition of equipment. This change from the Bankruptcy Act was Congress's reaction to "changes in financing practices and in the bankruptcy laws...." H.R.Rep. No. 595, 95th Cong., 1st Sess. 240 (1977), *reprinted in*, 1978 U.S.Code Cong. & Admin.News 5787, 6200. Therefore, section 1110's legislative history does not indicate that Con-

gress intended to limit its application to acquisition type of transactions.

Congress, however, realized that this extension of coverage was limited and did not apply to interests that amount to nothing more than a secured interest in an aircraft or other equipment. The congressional record states that "[t]he term [equipment security interests] includes only security interests that were granted to finance the acquisition of the covered equipment. A general mortgage is excluded." *Id.*

The legislative history of section 1110 should not be read in a vacuum since it is the successor to section 116(5) of the Bankruptcy Act, which expressly provided protection to lessors of aircraft and other equipment to air carriers. The possessor of the title of equipment is given much consideration in section 116(5). A look at the legislative history of section 116(5) teaches that Congress used the term lease freely without seeing a need to modify it. The professed purpose of section 116(5) was to "render immune from the provisions of chapter X of the Bankruptcy Act the *title* and right to repossession of such property." H.R.Rep. No. 944, 85th Cong., 1st Sess. (1957), *reprinted in*, 1957 U.S.Code Cong. & Admin.News 1926 (emphasis added). Again, this excerpt shows that what concerned Congress was the fact that the title in leased equipment did not lie with the debtor. Indeed, the legislative history of section 1110 also reveals Congress' concern over title. In explaining the reason for the exclusion of certain secured transactions from 1110 protection, Congress stated that "[t]he theory behind the present limitation is that under leases and conditional sales, *title* of the property does not pass to the debtor, but remains in the financier. Thus, it is appropriate to exclude what is not property of the estate from the automatic stay in a reorganization case." H.R.Rep. No. 595, 95th Cong., 1st Sess., *supra*, at 240 (emphasis added), 1978 U.S. Code Cong. & Admin.News at 6200.

Additionally, the legislative history of section 116(5) of the Act explains that the reason for its enactment was to increase availability of capital to air carriers at a lower interest rate. Congress observed that:

> Testimony before the Bankruptcy Subcommittee of this committee indicated that the smaller lines are presently unable to attract the capital necessary for their current re-equipment requirements. Testimony also indicated that the enactment of this bill would result in an increased availability of capital and at a lower interest rate than would be demanded under present conditions.

H.R.Rep. No. 944 85th Cong., 1st Sess., *supra* 1978 U.S.Code Cong. & Admin.News at 1926.

The Debtors claim that the lessors involved in Sale–Leasebacks not resulting in the new acquisition of equipment are getting through the back door what they could not get through the front door. But, this is not the case. Congress spoke of the increased availability of capital at lower interest rates. The Sale–Leasebacks under attack here accomplish just that. Clearly, the Debtors were in need of increased working capital. Had the Debtors sought a traditional secured loan, undeniably that creditor would not have enjoyed the benefits of section 1110 and therefore, most likely, would have requested a high interest rate in order to compensate for the risk it was assuming. In contrast, a person buying an aircraft from the Debtor and leasing it back would enjoy benefits of section 1110 and therefore the cost of obtaining this working capital would likely be less than if the Debtor had obtained a working capital loan using an aircraft as the collateral. The lessors were not the only ones gaining from the Sale–Leasebacks, the Debtors also benefited.

The Debtors repeat throughout their papers that a determination by this Court that these Sale–Leasebacks are section 1110 leases would cost the Debtors, approximately $33 million dollars in cure liability. The Debtors, because of their financial straights, may not be able to assume such an onerous cure liability. This troubles the Court, but the financial straights of the Debtor cannot in any way change and impact on this Court's legal analysis.

Justice Cardozo once said: "We do not pause to consider whether a statute differently conceived and framed would yield results more consonant with fairness and reason. We take this statute as we find it." *Anderson v. Wilson,* 289 U.S. 20, 27, 53 S.Ct. 417, 420, 77 L.Ed. 1004 (1933). Neither the statute nor its legislative history gives this Court cause to steer away from the plain meaning of the words of section 1110. Accordingly, the terms "lease" and "lessors" will not be read narrowly, rather their common meaning will be applied.

This determination falls in line with the bankruptcy court's decision in *In re Braniff, Inc.,* and is in direct contradiction with the bankruptcy court's ruling in *Matter of Continental Airlines, Inc.* (hearing on January 30, 1991). In both of those cases, the courts were faced with the same issue this Court is faced with.[5] The fact that both courts, in turning to the legislative history, reached completely opposite results magnifies the dangers of reading a congressional record in order to "glean" the intentions of Congress.[6] The statute clearly and unambiguously refers to "lease" and "lessor" without modifying or restricting those words; that is how this Court shall read section 1110.

## II. LEASE EXTENSIONS AND RENEWALS

 Essentially, the Debtors extend the argument asserted in the Sale–Leasebacks issue to whether section 1110 applies to lease extensions and renewals. In each of these transactions, the Debtors had previously entered into leases with respect to covered equipment. Subsequently, at the end of the original lease term, new leases were negotiated or the existing leases were extended. As articulated above, the application of section 1110 should not be restricted to leases which assist in the Debtor's new acquisition of equipment; section 1110 similarly applies to lease extensions and renewals.

## III. LEASES WITH DEBTORS NOT OPERATING UNDER A CERTIFICATE OF CONVENIENCE AND NECESSITY

Certain parties entered into transactions with Express, which at the time of the transaction was not operating under a Certificate but which subsequently, and prior to the bankruptcy filing, was certified. Other parties entered into transactions with Pan Am Corporation, a holding company that directly or indirectly owns all of the issued and outstanding stock of the other Debtors, which has never been certified. Pan Am Corporation in turn subleased the Aircraft and Equipment to one of its affiliated certified Debtors.

 Section 1110 applies to transactions with an "air carrier operating under a certificate of convenience and necessity issued by the Civil Aeronautics Board." 11 U.S.C. § 1110. While the statutory language does not clearly require that a debtor be certified at the time the transaction was entered into, to rule otherwise would lead to incongruous results. For example, if on the eve of filing for bankruptcy an air carrier became certified, such a reading would permit a creditor who had entered into a transaction with a non-certified air carrier several years prior to the bankruptcy to gain the benefits of section 1110. This would surely be an unexpected windfall to those persons who entered into transactions with air carriers that were not certified as of the completion of the transaction. Therefore, lessors who knowingly entered into lease

---

**5.** The court in *Braniff* was faced with the far-reaching issue as to whether section 1110 was intended to apply to only aircraft and equipment that are newly acquired by an air carrier lessee.

**6.** Courts are not alone in their conflicting interpretations of section 1110, commentators also differ. *Compare,* Giddens and Schick, *Section 1110 of the Bankruptcy Code: Time for Re-*

*fueling?,* 64 Am.Bankr.L.J. 109, 128 (1990) (wherein the commentators concluded that section 1110 applies to the financing of newly acquired equipment.); *with,* Gerstell and Patrinos, *Aviation Financing Problems Under Section 1110 of the Bankruptcy Code,* 61 Am.Bankr.L.J. 1, 25–6 (1987) (wherein the commentators concluded that section 1110 should apply to all leases across the board).

agreements with Express, prior to its certification, assumed the risk of not enjoying section 1110 status. The status of these parties will not be elevated because of Express' subsequent certification.

Unfortunately, some creditors claim to have entered into transactions with Express with the understanding of future certification. While this Court is sympathetic to those creditors' plight, it was never clear that subsequent certification would provide them with the section 1110 status they now seek. They assumed a calculated risk and have lost.

■ Parties who entered into transactions with Pan Am Corporation find themselves in an even worse position. Pan Am Corporation is not even an air carrier, let alone one operating under a Certificate. Section 1110 speaks of a debtor that is a certified air carrier. Nothing in the section nor its legislative history makes reference to transactions with affiliated debtors that are not certified air carriers which in turn sublease to a debtor that is a certified air carrier. To extend protection to these transactions would violate the language of section 1110. Moreover, Pan Am Corporation is a corporate entity separate and apart from its affiliated Debtors. Had these lessors wanted and intended to fall within section 1110's net of protection, they should have negotiated directly with the certified debtor.

## IV. PURCHASE MONEY EQUIPMENT SECURITY INTEREST TRANSACTIONS

General Electric Capital Corporation ("GECC") and United Technologies ("UT") allegedly are holders of PMESIs in aircraft and/or equipment of Pan American World Airways, Inc. ("Pan Am"). Pan Am alleges that its transactions with GECC and UT did not create proper PMESIs, and therefore, GECC and UT are not entitled to the benefits of section 1110 of the Code. UT has not filed either an objection or response

to the Debtors' motion to treat UT's interest as other than a PMESI (a non-PMESI), and therefore, UT will not be discussed.[7]

### A. PERTINENT FACTS

In 1985, GECC entered into a loan agreement with Pan Am which provided that Pan Am would apply the aggregate loan proceeds towards the purchase from GECC of 5 aircraft and 20 engines (the "Collateral"). The loan proceeds were also used for modification of the aircraft. The 1985 agreement was memorialized in a promissory note, security agreement and chattel mortgage. The instruments granted to GECC a security interest in the Collateral. However, the loan was not a "one-to-one" transaction; the loan was also secured by additional Aircraft and Equipment already owned by Pan Am. The additional Aircraft and Equipment were included allegedly to induce GECC to enter into the loan agreement. Further, there were certain antecedent non-purchase money obligations between Pan Am and GECC (and GECC's parent) from 1981 which were worked-into the 1985 transaction so that the 1985 Collateral would also act as security for the 1981 obligations.

In 1987, GECC extended an additional loan to Pan Am. The 1987 loan agreement provided that the 1985 Collateral, in addition to other collateral, would act as security for the 1987 loan. The 1987 loan was a general purpose loan and was not designed to finance the acquisition of any aircraft or equipment. Neither the 1981 nor the 1987 loan is a PMESI, and GECC admits this. Thus, this Court must focus on the 1985 loan.

### B. PAN AM'S ARGUMENT

Pan Am relies on the general rule of purchase money security interests which states: "if collateral secures debt other than its own price, it is *not* a PMSI." *In re Ionosphere Clubs, Inc.*, 112 B.R. 78, 83 (Bankr.S.D.N.Y.1990) ("*In re Ionosphere*

---

7. The Debtors and UT had apparently reached an agreement in principle. However, UT did file a response to the objection of the Creditors Committee to UT's § 1110 status. At the § 1110 hearing, this Court approved the agreement between the Debtors and UT over the objection of the Creditors Committee. *See* Transcript of March 7, 1991 Hearing at 44–55.

*Clubs"*). Thus, the traditional PMESI is *not* created if the lien secures pre-existing debt (like the 1981 loan), the loan was not advanced solely to acquire the collateral (the 1985 aircraft modifications), or additional pre-existing collateral is added to the transaction as additional security or inducement for the lender (the 1985 loan). *See e.g., Roberts Furniture Co. v. Pierce (In re Manuel)*, 507 F.2d 990, 993 (5th Cir. 1975); *Southtrust Bank v. Borg–Warner Acceptance Corp.*, 760 F.2d 1240, 1243 (11th Cir.1985); *Booker v. Commercial Credit Corp. (In re Booker)*, 9 B.R. 710, 711 (Bankr.M.D.Ga.1981).

## C. GECC'S ARGUMENT

GECC relies on a recent decision of the district court wherein Judge Sweet reversed the decision of the bankruptcy court in *In re Ionosphere Clubs*, which confronted a similar issue in the Eastern Airlines bankruptcy. *First Nat'l Bank v. Shugrue (In re Ionosphere Clubs, Inc.)*, 123 B.R. 166 (S.D.N.Y.1991) (*"Ionosphere"*). In *Ionosphere*, Judge Sweet explicitly held that where the proceeds of a loan are used to purchase aircraft and equipment, and the aircraft and equipment also secure other indebtedness, the lender has a PMESI with respect to the identifiable amount of such loan. *Ionosphere*, at 171, 173.

## D. DISCUSSION

Pan Am and GECC read *Ionosphere* differently. Since *Ionosphere* is a recent case from our district which appears to be on point, this Court will analyze and compare the district court's opinion in *Ionosphere* with the case at hand.[8]

In *Ionosphere*, several lenders (the "Airbus Lenders") made loans in 1978 and 1981 (the "Airbus Loans"), under an indenture established in 1963, to Eastern Airlines to finance the acquisition of certain aircraft (the "Aircraft"). When purchased, the Aircraft became part of a "floating collateral pool" which was established by the indenture and consisted of aircraft, engines and parts owned from time to time by Eastern. The actual property in the pool changed over time as old property was removed from the pool and new property was added. The indenture permitted future advances from lenders and had after-acquired property clauses. All of the loans subject to the indenture were equally and ratably secured by the collateral pool. Consequently, the Aircraft secured debt other than their purchase price, and the Airbus Loans were secured by collateral other than the Aircraft. Moreover, the Airbus Lenders did not have a specific lien on the Aircraft. Rather, under the terms of the indenture, the Airbus Lenders had at any given time an equal and ratable claim on the collateral pool as it existed at the time, and the actual lien on the collateral pool was held by the indenture trustee. If Eastern removed any aircraft from the collateral pool (by sale or otherwise), it was immediately required to prepay the outstanding amount of the note associated with that aircraft.

When Eastern filed for bankruptcy protection, the Airbus Lenders claimed to have the protection of section 1110 as holders of PMESIs in the Aircraft. The bankruptcy court found that the security interest of the Airbus Lenders was not a PMESI because the Aircraft not only secured airbus loans, but also the antecedent debts owed to the other lenders with interest in the collateral pool. *In re Ionosphere Clubs*, 112 B.R. at 83–88. This determination was based on the general rule of PMESIs, i.e., if the collateral secures more than its own purchase debt it is not a PMSI. *Id.*

In reversing the bankruptcy court decision, Judge Sweet rejected the "transformation rule" and adopted the "dual status" rule. *Ionosphere*, 123 B.R. at 171–173. The transformation rule examines whether a refinancing, in which purchase money debt is restructured or replaced with new debt, defeats PMSI status for the lien securing the refinancing debt. *In re Ionosphere Clubs*, 112 B.R. at 78. The bankruptcy court determined that the Airbus Loans were not PMESIs based on the general PMSI rule, and although it discussed the transformation rule, the bankruptcy

**8.** The following discussion of facts is taken from pp. 169–170 of the *Ionosphere* opinion.

court felt it was not necessary to go that far. *Id.* at 84. Judge Sweet explained that the dual status rule is so-called "because it allows a security interest to have both the status of a PMSI to the extent that it is secured by collateral purchased with loan proceeds, and the status of a general security interest, to the extent that the collateral secures obligations unrelated to its purchase." *Ionosphere,* 123 B.R. at 172.

The result of the application of the dual status rule to the Airbus loans was that so long as the creditor was able to determine the outstanding balance of any purchase money indebtedness, that portion would be protected under section 1110. Thus, Judge Sweet followed, and gave strength to, the modern trend which recognizes that only the security interest which secures the non-purchase price debt is not a PMSI, but the interest which secures the purchase price debt retains its PMSI character.[9]

Thus, upon repossession and sale of the collateral, proceeds may only be applied to satisfy the purchase price debt. Any surplus would be returned to the debtor, to be held for the benefit of all creditors who held non-purchase money security interests in that collateral. When the PMSI exceeds the value of the collateral, the PMSI would cover the entire collateral. *Id.* at 173.

Judge Sweet discussed the problem of the allocation of a loan payment amount to PMSI and non-PMSI interests. *Id.* at 173. In *Ionosphere,* he found no problem of allocation because the differing obligations were owed to different creditors. *Id.* at 173. However, Judge Sweet also discussed the issue of when the debtor has taken multiple loans from a *single* creditor to finance multiple purchases, with each loan secured by security interests in *all* the purchased property (similar to the case, *sub judice*). *Id.* 172–173. He concluded that although this situation could be complex, so long as the creditor had a method for determining how much of a PMSI ex-

ists in each of the purchased items, the creditor would retain its preferred standing in the collateral. *Id.*

This Court adopts the reasoning set forth by Judge Sweet and follows the *Ionosphere* decision. The lending arrangements relating to the 1985 loan between Pan Am and GECC present, possibly, an even more compelling set of facts for the application of the dual status rule as described in *Ionosphere.*

For example, here, there is no floating collateral pool with multiple lenders that have equal and ratable claims on the pool as a whole. GECC is a lienholder itself; there is no indenture trustee which is the lienholder, as in *Ionosphere.* The 1985 loan instruments do not include any provisions purporting to secure future advances or place liens on after-acquired property. The Court is cognizant that the 1985 loan involved cross-collateralization of pre-existing debt which might not have existed with the Airbus Loans in *Ionosphere.* However, there was pre-existing debt and pre-existing collateral within the *Ionosphere* collateral pool upon which each lender had an equal and ratable lien. Thus, *Ionosphere* is not as distinguishable as the Debtors would suggest.

*Ionosphere* requires that a creditor be able to determine the outstanding balance of purchase money indebtedness. Here, GECC can easily determine the amount of its PMESI by reference to the 1985 notes. GECC is only looking to, and can only, reclaim the PMESI amount from the 1985 loan, not on any of the cross-collateralization of the previous or subsequent loan transactions. To the extent that there has been payment on the 1985 PMESI notes, the amount of the PMESI is decreased.

Finally, Pan Am claims that the instant case differs from *Ionosphere* in that the Airbus Lenders' collateral consisted of cash collateral, rather than aircraft or equipment.[10] However, it is clear that Judge

---

9. The dual status theory is somewhat analogous to claim bifurcation under § 506 of the Code.

10. Eastern had sold the aircraft in dispute pursuant to orders which were without prejudice to the rights of the parties under § 1110 and that

the proceeds would be held in escrow and would be deemed equivalent to the aircraft for the purposes of the § 1110 dispute. *Ionosphere,* at 170.

Sweet's decision did not hinge on this fact. Rather, it appears to be consistent with Judge Sweet's decision that so long as the creditor has a valid PMESI, and is entitled to priority under the Uniform Commercial Code and the Bankruptcy Code, it retains its preferred standing and is able to exercise whatever remedies are provided for in its agreement with the debtor. To the extent that the value of the collateral exceeds the amount of the valid PMESI, the creditor must return the surplus to the debtor. It is of no moment for a debtor to argue that the creditor should not be able to exercise its repossession remedies because the value of collateral far exceeds the amount of a PMESI; that is specifically what the parties bargained for when they entered the PMESI transaction.

In sum, the facts relating to the 1985 loan clearly fall within the realm of Judge Sweet's decision and this Court is persuaded to follow *Ionosphere* and apply the dual status theory. Consequently, *Ionosphere* establishes that GECC's lien on the 1985 aircraft and equipment is a PMESI to the extent that it secures the 1985 purchase money debt, and to that extent, it is protected under section 1110.

## V. EQUIPMENT SWITCHING/POOLING ARRANGEMENTS

The Creditors Committee argues that to the extent an alleged lease or PMESI agreement permits interchange or pooling of aircraft parts and equipment, which would allow for replacement of a lien onto different equipment than that originally provided by the creditor directly, or the equipment provided through the creditor's financing, the transaction falls outside the protection of section 1110. This is so because the claimant thereby releases its rights to the specific, identifiable property originally encumbered. The Committee asserts that the end result of this exercise is a sale.

To the extent that a pooling or interchange agreement relates to an alleged PMESI, this Court follows the decision of Judge Sweet in *Ionosphere*, which permitted such arrangements to retain their PMESI character under the "dual status" rule. The dual status rule applies so long as the PMESI amount and the property to which it relates are identifiable.

As for alleged lease transactions, if under the lease agreement the lessor is permitted to repossess aircraft or equipment, and under the interchange or pooling arrangement the collateral to be repossessed is identifiable and equivalent, despite the fact that it is not the same collateral originally loaned, the arrangement falls within the protection of section 1110.

This determination is necessary because the vast majority of lease transactions in the airline industry include provisions which permit an airline lessee to exchange airframes,[11] engines or other parts through pooling or interchange agreements and to replace equipment which becomes destroyed, worn out, lost or damaged beyond repair with a replacement engine or part of like quality or value. Affidavit of Nils Hallerstrom at ¶ 3; *see also* Memorandum of Creditors Committee at 11, n. 5. The fact that such exchange is permitted by the express terms and conditions of a lease does not transform the lease into something else. The equipment, or its equivalent, must be returned to the lessor at the end of the lease. Therefore, as a policy consideration, this Court is loathe to alter this uniform practice of aircraft leasing developed by those in the industry over many years and currently implemented. Thus, provided that at the end of the lease the lessor will have title to, and be entitled to recover, specific, identifiable property, the lease will come within the protection afforded lessors under section 1110. This is so, despite the reality that equipment, engines or parts thereof may not be that which was originally leased. Indeed, in Uniform Commercial Code section 2A–103 a lease is defined as "a transfer of the right to possession and use of goods for a term in return for consideration." U.C.C. § 2A–103(j). There is no requirement that

---

11. In the case of an airframe, title thereto always remains with the lessor, and at the termination of the lease, that particular airframe must be returned to the lessor.

specific, identifiable property be redelivered.[12] The substitution provisions at issue here do nothing more than enable the Debtors to operate the aircraft in the normal course of its business, which unquestionably requires the frequent servicing, and thereby the frequent substitution, of various of each aircraft's parts, including its engines.

## VI. TRUE LEASES

The Debtors urge that many of the transactions are not leases, but are disguised non-purchase money security interests which are not protected by section 1110. The Debtors assert that the Court must hold an evidentiary hearing on each challenged lease to determine whether it is a true lease or merely a disguised security interest, before the Court can permit any repossession under section 1110. However, the Debtors do not specify which transactions are not true leases, but rather list in exhibit "E" those which are proper leases subject to section 1110.

The Debtors and various lease claimants have addressed the true lease issue. Collectively, they set forth the assorted tests for determining whether a transaction in substance is a lease or a security interest (for general loan or sale). For the most part, they rely on the same authorities.

This Court has reviewed the various tests and factors set forth in case law and elsewhere, and discerns that they are collectively similar, if not identical, to the factors set forth in the Uniform Commercial Code.[13] Section 1–201(37) sets forth the relevant inquiries.[14] It is clear to this Court that the mere fact that a transaction is denominated as a lease is not dispositive

---

**12.** The Creditors Committee's citation to 5 King, *Collier on Bankruptcy* § 1110.01 at 1110–19 (15th ed. 1990), is misleading. Committee Memo. at 10. The Committee urges that the quote supports its view that interchange destroys the protection of § 1110. The citation in its entirety states:

> Section 1110 does not protect a secured party or lessor unless such secured party or lessor has the right to take possession of the equipment which it financed under the terms of the security agreement, lease or conditional sale contract between the financers and the debtor. *The right to take possession must be explicit in the agreement or contract.*

*Id.* (emphasis added to portion not included by Committee in their memorandum). There is no suggestion that a right under an agreement to return equivalent property in lieu of the original property will render § 1110 inapplicable. *Collier* merely seeks to emphasize the statutory requirement that the right to take possession must be explicit in the agreement or contract.

**13.** Relevant authorities include *Nynex Bisc v. Beker Indus. Corp. (In re Beker Indus. Corp.)*, 69 B.R. 937, 939 (Bankr.S.D.N.Y.1987); *In re The Answer—The Elegant Large Size Discounter, Inc.*, 115 B.R. 465, 469 (Bankr.S.D.N.Y.1990); *In re Alpha Creamery Co.*, 4 U.C.C.Rep.Serv. 794, 797–98 (Bankr.W.D.Mich.1967).

**14.** Section 1–201(37) states, in part:

> Whether a transaction creates a lease or security interest is determined by the facts of each case; however, a transaction creates a security interest if the consideration the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease not subject to termination by the lessee, and
> (a) the original term of the lease is equal to or greater than the remaining economic life of the goods,
> (b) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods,
> (c) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement, or
> (d) the lessee has an option to become the owner of the goods for no additional consideration or nominal additional consideration upon compliance with the lease agreement.
> A transaction does not create a security interest merely because it provides that
> (a) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into,
> (b) the lessee assumes risk of loss of the goods, or agrees to pay taxes, insurance, filing, recording, or registration fees, or service or maintenance costs with respect to the goods,
> (c) the lessee has an option to renew the lease or to become the owner of the goods,
> (d) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed, or
> (e) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

of the issue. It is evident that a fact-intensive inquiry into each alleged lease is required for such a determination. However, this Court does not have the luxury to do so at this late time.

Our situation is unlike that faced by the court in *Liona Corp. v. PCH Assocs. (In re PCH Assocs.)*, 804 F.2d 193 (2d Cir.1986), in which the Debtors place great reliance. In *Liona Corp.*, a lease subject to section 365(d) was in issue, and the court had the time to determine whether the transaction was a lease or a security interest, because the court under section 365 can unilaterally extend the time to assume or reject, and is not prohibited from exercising its equitable powers under section 105.

Here, this Court is explicitly prohibited from extending the 60 day period under section 1110 unless the interested parties so agree. The language of section 1110 plainly provides that a lessor's right to take possession remains unaffected "by section 362 or 363 of this title or by any power of the Court to enjoin such taking of possession." 11 U.S.C. § 1110(a). Section 1110 is one of the few provisions in the Code limiting the broad equitable power of this Court codified in section 105(a). Accordingly, if this Court, pursuant to the Debtors' request, engages in fact-intensive evidentiary hearings to determine whether certain leases are true leases before the lessors can exercise their rights under section 1110, the 60 day period provided in the section will be emasculated. The Debtors could then retain possession of the aircraft and continue to use it well beyond the 60 day period while the lessors remain unpaid. However, the plain language of section 1110 precludes such a result.

In sum, this Court has no authority at this late date to prevent lessors with the right to repossess under their agreement from doing so pursuant to section 1110. However, such parties act at their peril if their alleged leases are not true leases. If a lessor so acts and it is subsequently determined that the transaction was other than a lease protected by section 1110, such party will be responsible for return of the collateral or proceeds, damages, costs etc. In addition, there would be a violation of the automatic stay, and although sanctions may not be levied under section 362(h), such action would be a violation of this Court's order prohibiting such action against the property of the estate and would be subject to contempt sanctions.

This Court will not issue any "comfort order" to the alleged lessors. If they desire this Court's approval, they may commence an adversary proceeding and file a motion for declaratory judgment that § 1110 applies to their specific transactions with the Debtor, or take whatever steps they deem necessary.

## CONCLUSION

In conclusion, this Court holds that: (1) the Sale–Leasebacks are subject to section 1110; (2) lease extensions and renewals are similarly protected; (3) section 1110 only applies to transactions entered into with air carriers that were certified at the time of the transaction; (4) the PMESIs of GECC are protected by section 1110; (5) equipment switching and pooling arrangements in an agreement do not remove the transaction from the protection of section 1110; and, (6) this Court has no authority at this late date to prevent alleged lessors from acting pursuant to section 1110; however, those parties act at their own peril.